TAIT, PLAINTIFF, *v.* NORTH AMERICAN EQUITABLE LIFE ASSURANCE CO., ET AL., DEFENDANTS.

Common Pleas Court, Hamilton County.

No. A-175308. Decided January 31, 1963.

*Messrs. Goodman & Goodman*, for plaintiff.
*Messrs. Frost & Jacobs*, for defendants.

LEIS, J. The plaintiff, John M. Tait, hereinafter referred to as "Tait" filed his petition in the Common Pleas Court of Hamilton County, Ohio, on March 9, 1960, naming as co-defendants the North American Equitable Life Assurance Co., a legal Reserve Life Insurance Company, incorporated under the insurance laws of the State of Ohio, hereinafter referred to as

"North American," and the individual members of the Board of Directors of North American.

The Court, prior to this trial which commenced on October 23, 1961, dismissed the members of the Board of Directors as parties, and the case proceeded against the only remaining defendant, namely, North American. A trial by jury was waived by both parties. The trial proceeded, with some interruptions for the purpose of taking depositions, and for other matters, the last day of hearing being December 1, 1961. On December 4, 1961, both parties submitted the case to the Court, and it was agreed that counsel would prepare written briefs and file them with the Court in lieu of oral closing arguments. Briefs were filed, the final brief was received in June 1962. The testimony was transcribed consisting of 752 pages.

The Court has read and studied this testimony, together with the fifty-seven exhibits submitted as evidence and the two stipulations (marked A and B). The Court at the outset wishes to thank and to express its sincere appreciation to both counsel for their excellent, well-written and very comprehensive briefs.

Tait in his petition, in substance, sets forth as his cause of action against North American, that he, as a licensed and registered securities dealer under Ohio law, entered into a "Distribution Agreement" with North American to sell 950,000 shares of their two dollar ($2.00) par value Common Stock at ten dollars ($10.00) per share. (To avoid repetition the Agreement is outlined later in this Decision.) This Agreement was signed on November 24, 1958. Tait stated that he expended large sums of money in establishing an office and sales force in order to carry out his contractual obligations. The shares offered were to be sold intra-State and were exempt from United States Securities and Exchange Commission jurisdiction and control. The plaintiff alleges that before the issue was completely sold, North American purchased and merged with a Maryland Life Insurance Company and as a result of this act of the defendant the (stock issue) sale was stopped by S. E. C., and the defendant has done nothing to bring about compliance with the regulations and law as required by the contract.

Tait alleges that North American has breached its contract with him and he claims damages in the sum of $758,231.00, plus interest and costs,

North American's answer, in substance, sets forth that the admitted merger of the Maryland Insurance Corporation into North American was not unlawful and that Tait had full and complete knowledge of all plans of the merger, participated fully and was present at all meetings and hearings when the merger was discussed and acted upon. The defendant also denies that the sale of its stock by Tait was halted by the S. E. C. (letter to Tait of January 14, 1960) and denies that North American breached its contract with Tait. The plaintiff's reply specifically denies the defenses and affirmative matters set up by the defendant in its answer.

As previously stated the testimony and evidence is very extensive and this court will attempt to summarize it as much as possible. The evidence presented the following facts:

Tait had previously been engaged in the business of buying and selling of stock in new corporations.

Early in 1957, Mark Kroll, an incorporator and first president of North American, communicated with Tait about the possibility of Tait handling the sale of securities in an insurance company to be formed.

Tait moved his family and office to Cincinnati January 4, 1958, the details of the corporate plans were finalized and Articles of Incorporation of North American Equitable Life Assurance Co., were drawn up and signed by thirteen incorporators. The Attorney General of the State of Ohio approved the Articles for filing January 21, 1958.

The original plan was to sell one million shares of Two Dollar Par Value Common Stock at Ten Dollars per share. Under Ohio law a life insurance company cannot engage in the life insurance business in Ohio until all capital stock is sold. The plan was modified and fifty thousand shares of the above stock were to be the initial capitalization of North American (this fifty thousand share offer is to be referred to as the "First Issue").

On January 21, 1958, Mark Kroll, as agent for North American, and Tait, executed a Distribution Agreement for the sale of the "First Issue."

Tait and another sold the "First Issue" completely by July 1958.

August 9, 1958, the first meeting of the shareholders of North American was held, nine directors were elected and Mark Kroll was elected president of North American.

Application was made for a "Certificate of Authority" to engage in the life insurance business in Ohio. Superintendent of Insurance (Ohio) refused. Three directors were non-residents of Ohio. These directors were replaced by newly-elected Ohio resident directors and Certificate was issued to North American on November 6, 1958.

November 24, 1958, at a special Board of Directors meeting a resolution passed to increase Capital Stock from fifty thousand shares to one million shares of Two Dollar Par Value Common Stock to be sold at Ten Dollars per share (to be referred to as the "Second Issue").

On the same date, November 24, 1958, Tait and North American entered into a second "Distribution Agreement" giving Tait exclusive right to sell this "Second Issue" for thirty-six months.

November 26, 1958 the necessary registration and qualification of the "Second Issue" was completed and approved and, on January 12, 1959, Tait began the sale of the "Second Issue."

At a regular meeting of the Board of Directors, January 23, 1959, the directors discussed the possibility of purchasing and acquiring existing life insurance companies and agreed that the management should hire a full-time employee in connection with making such purchase, and agreed that secrecy in identification of a company contemplated for purchase was important so that possible negotiations would not be prejudiced by any premature identification.

At the annual meeting of the shareholders of North American, on April 3, 1959, Mark Kroll, President, announced that North American was negotiating a merger of a Maryland Life Insurance Company into North American. A Board of Directors Meeting followed and the directors (George Schoonover moved and Richard Troupe seconded) authorized Kroll to conclude the negotiations to effect the purchase of Independent Life Insurance Co., Maryland, and to execute whatever documents were necessary for the purpose.

On April 26, 1959, at a special Board of Directors Meeting the Purchase Agreement was approved. (Motion by Taylor, seconded by Baker.) By a second motion (Troupe, seconded by Swinehart) the President was authorized to do whatever necessary to qualify North American to do business in the state of Maryland.

A Special Shareholders' Meeting was called for May 22, 1959, which approved, confirmed and ratified the action taken by the Board of Directors. (Motions were made, one by Troupe and one by Heiser.)

The Superintendent of Insurance (Ohio) suspended stock sales of the Second Issue on October 30, 1959 until a new prospectus was issued to reflect an ordered change in management and the acquisition of the Maryland Insurance Company.

November 7, 1959, Board of Directors accepted resignation of Mark Kroll and James A. Lantz was elected president.

Suspension of Second Issue sale was lifted, after new prospectus reflecting these changes was issued December 2, 1959.

January 14, 1960, the Chicago Regional Administrator of the U. S. Securities & Exchange Commission (hereinafter referred to as "S. E. C.") directed a letter to Tait in substance stating that there appeared to be a serious question whether or not North American stock of the Second Issue could continue to be sold in the absence of a registration with the S. E. C. because North American "has done substantially no business in the State of Ohio up to the present time but that it has, on the contrary, acquired a wholly owned subsidiary conducting substantial business operation in Maryland."

January 22, 1960, at a Board of Directors Meeting in Maryland the problem was informally discussed, and Tait and Lancione (general counsel for North American) were instructed to go to Chicago and confer with S. E. C.

January 25, 1960, Tait and Lancione met with S. E. C. No decision available and the matter was referred to Washington for decision. (S. E. C. indicated to Tait that since he was on notice that a question had been raised concerning the exemption of the Second Issue from S. E. C. registration, any sales pending the ruling from Washington might be interpreted as "wilful" violation of the law.)

Between February 4, 1960, and March 9, 1960, Lancione went to S. E. C. in Washington. A staff member of S. E. C. *orally* took the position that the exemption under which the Second Issue was being offered would not be available since the company did not appear to be doing a substantial insurance business in the State of Ohio, but was doing a substantial business in Maryland and that future sales without proper registration with S. E. C. would be considered wilful; Lancione reported this oral position to the Board of Directors of North American and to Tait; neither party herein took further action before March 9, 1960, with respect to the subject matter in question. (Stipulation B.)

Tait and his chief assistant, Broderick, met with Lantz at Lancaster, Ohio, on February 25, 1960. Testimony is conflicting concerning the matters discussed.

March 9, 1960, two weeks later, Tait filed suit alleging breach of contract.

The second Distribution Agreement is the basic document to the issues in this case. The agreement is long and will not be repeated herein, but the pertinent items of the Agreement are summarized as follows:

(A) North American shall apply for Qualification of Securities with the Superintendent of Insurance (Ohio) per Sections 1707.09 and 1707.32, Revised Code, for registration of 950,000 shares of its Common Stock for sale to bona fide residents of the State of Ohio for $10. per share; and the company shall comply and continue to comply with all of the laws, rules, and regulations pertaining to said regulations.

(B) Tait was given exclusive selling agency for thirty-six months; could register other persons (properly licensed) to aid in the sale; the agreement was personal to Tait (non-negotiable). Tait was to prepare all advertising and printed matter (subject to North American approval), and all material was to be truthful and in no way misleading.

(C) Tait's commission was to be fifteen per cent of sales' price. Sale price of stock was $10. per share, and stock was to be offered and sold only within the State of Ohio, and was subject to any conditions and regulations as may be required by the Superintendent of Insurance (Ohio).

(D) Tait agreed to pay all filing and registration fees and counsel fees in the qualification of said securities with the Superintendent of Insurance for the State of Ohio, and all necessary promotional expenses incurred in the offer and sale of said securities. It is understood and agreed that the sole purpose of this paragraph 7 is to assure compliance with Section 1707.32, Revised Code, limiting the commission, promotion, and organization expenses of a corporation organized to make any insurance to fifteen (15%) per cent of the amount received upon subscription." (Item 7 of Distribution Agreement.)

(E) Termination of Agreement upon (1) completion of sale; (2) disqualification by Superintendent of Insurance (Ohio); (3) death, etc. of Tait; (4) if sale not completed within thirty-six months.

(F) Item 15 concerned 450,00 shares of the Second Issue in that North American reserved the right to dispose of them, with no commission to Tait, but pro-rata reimbursement of his expenses.

The Court is confronted with a very unique question of fact and law in this case. Since "breach of contract" is the basic issue involved, the first matter of importance is to define the term. Many authorities have proposed definitions of this term, and the Court quotes them as much as they are applicable to this case.

*Corbin.* "A breach of contract is always a non-performance of duty; but it is not every non-performance of duty that is a breach of contract. * * * Whenever there is legal justification for the non-performance of a promise there is no breach of a contractual duty." (Vol. 4, Sec. 943.)

*Williston.* "* * * a breach of contract is a failure, without legal excuse, to perform any promise which forms the whole or any part of a contract." (Vol. 5, Sec. 1228.)

*Restatement of Law—Contracts, Section 312. Breach of Contract—Defined:*

"A breach of contract is a non-performance of any contractual duty of immediate performance."

Comment: "(a) The expression 'breach of contract' is confined to wrongful conduct. The promisor does not necessarily commit a breach if he fails to perform his promise * * *."

*Section 314.* "A failure without justification to perform all or any part of what is promised in a contract, is a breach thereof."

Comment: "(a) * * * Failure to perform anything promised in a contract, if the failure is unjustified, is a breach * * *."

"Justification * * * includes any facts that as a matter of substance prevent an act from being wrongful * * *."

11 Ohio Jurisprudence (2d), Section 265. "The word 'breach' as applied to contracts, is defined as a failure without legal excuse to perform any promise which forms a whole or a part of a contract, including the refusal of a party to recognize the existence of the contract or the doing of something inconsistent with its existence." (*National City Bank* v. *Erskine & Sons, Inc.,* 158 Ohio St., 450, 49 Ohio Opinions, 395; 110 N. E., 598.)

"It is fundamental that a party may violate his contract at any time, but that if he does so wrongfully, an action may be maintained against him for damages." (*Van Cartfort* v. *Colmar Realty Co.* (App.), 13 Ohio Law Abs., 499.)

Essentially, a breach of contract is always a non-performance of duty under a contract. However, exceptions to breach a contract are recognized when non-performance is based upon "legal justification" or upon a "legal excuse" not to perform under a contract, or by a "waiver" recognized as such in law.

"A waiver of any terms of the contract may be * * * by the acts and conduct of the parties." (11 Ohio Jurisprudence (2d), Contracts, Sec. 238-248, specifically p. 499.)

Tait in his petition alleges that the merger of the Independent Life Insurance Company, Baltimore, Maryland, into North American "was contrary to, and in violation of the laws of the State of Ohio but, notwithstanding said fact, said Board of Directors (of North American) took such action for the purchase of said Independent Life Insurance Company * * *" and Tait further alleges that "on January 14, 1960, he was advised by S. E. C. to halt the sale of the securities in that the securities were not entitled to exemption from registration requirements under Section 3 (a) (II) of the Securities and Exchange Act by reason of the illegal action of the corporation

\* \* \* in the purchase of said Independent Life Insurance Co. of Baltimore, Maryland, through which said corporation was in effect, selling insurance, and that by reason thereof, the transactions in the sale of stock were activities in interstate commerce and were not exempt transactions." Tait then alleges "that the defendant \* \* \* has done nothing to bring about compliance with the regulations and laws, as required under said contract, and by reason thereof, has been guilty of a breach of said Agreement."

Tait based his allegation of breach of contract on item 1 of the Distribution Agreement of November 24, 1958, which in part is as follows:

"The Company shall cause an Application for Qualification of Securities, including a form of Prospectus, to be filed with the Superintendent of Insurance for the State of Ohio, as provided in Sections 1707.09 and 1707.32, Revised Code, for the registration of 950,000 shares of its common stock of which 950,000 shares will be qualified and offered for sale at $10.00 per share only within the State of Ohio to bona fide residents thereof who are not purchasing for the purposes of resale to non-Ohio residents, and the Company shall comply and continue to comply with all the laws, rules and regulations pertaining to said registration."

Tait argues that the defendants' acquisition (by merger) of the Maryland Insurance Company changed the conditions agreed upon through the Distribution Agreement. He contends that if he had not agreed to stop the sale on January 25, 1960, the S. E. C. could have instituted criminal prosecution, and also could have brought injunctive proceedings against him and/or North American. He, therefore, assumes the position that the burden is on the defendant to establish that it was entitled to the exemption, or the burden was on the defendant to register the securities with S. E. C. Tait states further that this Court has to construe the Contract from the language used, and cites the case of *New York Central Railroad Company* v. *General Motors Corporation* (12 Ohio Opinions (2d), 349, 182 Fed. Supp., 273) which states:

"The primary rule in construing contracts is that the intent or purpose shall be gathered chiefly from the language em-

ployed by the parties, and where there is no doubt as to the effect to be given to the language used, there is no right of construction.

"Where a contract is plain and unambiguous, it does not become ambiguous because of the fact that in its operation it will work a hardship upon one of the parties thereto and a corresponding advantage to the other.

"The greatest latitude shall be given in developing the surrounding situations and conditions attending the negotiations for the consummation of a contract, and the language employed should be construed in the light of circumstances surrounding the contracting parties at the time."

The plaintiff argues that the Contract clearly specified that the company desired to sell its stock only to bona fide residents of Ohio who did not purchase it for the purpose of resale to non-Ohio residents and, therefore, that the defendant promised not to acquire an out-of-state company.

This Court disagrees with the plaintiff's contention. The Court has a right, and a duty, under the facts and evidence herein to look beyond the written words of this Contract, and to examine the intentions of the parties at the time the Contract was entered into.

11 Ohio Jurisprudence (2d), Contracts, Section 156. "Reasonable Construction"; Section 157. "Just Construction"; Section 158, "Practical Construction"; Section 144, "Implications"; *New York Central R. R.* v. *General Motors, supra.*

What, then, were the circumstances surrounding this Contract and the intentions of the parties at the time it was signed by them? It is apparent from the evidence that at the start of the planning of this insurance corporation, the organizers formulated the idea to develop the corporation's insurance business through the purchase of existing insurance companies. At no time, in discussions covering the purchase of existing insurance companies, was there any limitation, restriction or suggestion that existing companies to be purchased were to be Ohio companies. The Court notes that in the Prospectus, dated December 1, 1958, the first Prospectus issued after the Contract for the Second Issue was signed, the following statement appears:

*"The Product and the Market.*

"The Company plans to confine its early operations to the State of Ohio, but to expand into other states as soon as practical."

A similar statement appears in the December 2, 1959, Prospectus:

"The Company plans to qualify and do business in other states as soon as practical."

The original Articles of Incorporation specified a capitalization of one million authorized shares. The organizers, after being shown that under Ohio law an insurance company could not engage in any insurance business until all its capital was first paid in, reduced the initially authorized shares to fifty thousand shares. The intent, at the time of this revision, was to secure the corporation's "Certificate of Authority" from the state of Ohio as soon as possible and then, under proper corporate procedure, to increase the authorized capital stock to one million shares.

The question arises—Why the large capitalization? The evidence indicated that all the persons involved in capitalizing and organizing North American—the promoters, the incorporators, Tait, the shareholders—knew and contemplated that the capital of ten million dollars was primarily for and intended for the purpose of purchasing existing insurance companies.

The evidence is conclusive that Tait and his entire sales personnel, in their discussion with prospective stockholders emphasized this plan in their sales presentations of the First and Second Issues. Mr. Alva Taylor, an incorporator and a director, purchased his stock in 1958 (First Issue). Tait sold him the maximum shares offered to any one person, namely seven hundred fifty (750) shares. The Court quotes some of Taylor's testimony to illustrate the early intent of the organizers of this corporation and the sales approach used by Tait:

(Page 405, Bill of Exceptions.)

"Q. Mr. Taylor, what representations or statements did Mr. Tait make to you in his effort to sell you stock in the defendant?

"A. (Taylor) He said oftentimes, life insurance companies started with too small a capitalization. He proposed that this

be a large capitalization of this company. In fact, the largest original capitalization of any life company. He said that we would not go the expensive route of getting in business meaning, he said, going out and hiring agents to sell insurance.

"He said we would propose to buy companies that were already in existence. By doing that we would be admitted to other states without the lengthy procedure that you normally go through; we would acquire their seasoned business that was already in force; we would acquire their established agencies as well as their forms. We would be in business immediately upon acquisition of the company.

"Q. Did he say anything further?

"A. He said he hoped by doing this we would pay a dividend the first year of the company's existence.

"Q. Did he say anything further?

"A. Well, there was a lot of conversation that went on, yes, but specifically * * *.

"Q. Well, just take your time and think about this subject; and to the best of your remembrance repeat the substance of anything that Mr. Tait said to you in an effort to persuade you in the first instance to buy stock in the defendant?

"A. Well, another thing that comes to my mind. I had not yet met Mr. Kroll but he said he had, through his already established connections of other insurance companies in thirty-four states, he had agencies, most of which were casualty, but if just one of these agents sold one policy a year, it would represent a substantial amount of insurance business. I didn't remember the number of agents, but I do remember the number of states that were purportedly involved in his various holdings.

"Q. Is there anything else that Mr. Tait said at that time?

"A. Well, he said that if I purchased stock, as I have already stated, I would be expected to be an Incorporator and also Director of the company."

Mr. Homer Heiser, Frank W. Baker and George F. Schoonover, who were also incorporators and directors, testified in substance the same as above, as did Mr. Swinehart and Russell Troupe, who later became directors.

Mr. Johnson, who sold one-half of the First Issue along

with Tait, confirmed the sales approach as described above. When he was asked in his deposition "how soon it was contemplated that North American would acquire one or more going companies in the life insurance field," he stated—"there was no specific time table * * * it was dependent upon the availability of good acquisitions * * * and the money to buy the companies." When asked from whom he received his information he said from Mr. Tait.

These were some of the circumstances under which the parties drafted the Distribution Agreement for the sale of the Second Issue.

Another surrounding circumstance of importance to this Contract is the participation by the plaintiff in the affairs of the defendant corporation.

The Court recognizes that the sale of ten million dollars of Capital Stock demands that the dealer selling the stock issue maintain close liaison between himself and the issuer but the evidence shows conduct of greater import than a mere "reporting of progress of the sales." This Court has no doubt but that Tait was a part of the corporate plan from its very inception. He moved to Cincinnati and worked closely with Mark Kroll. Tait personally secured the signatures of many of the Incorporators. He attended all directors' meetings, regular and special, all shareholders' meetings, and many witnesses testified to his active participation in these meetings. Tait himself testified that he paid all costs incidental to the meetings, and many of the directors' meetings were held in his office. Tait solicited Incorporators, Heiser, Baker, Taylor and Schoonover, in the manner testified to above by Mr. Taylor. Six directors were urged to be directors by Tait, namely, Heiser, Baker, Taylor, Schoonover, Dr. Swinehart and Troupe. These six directors comprised a majority of the Board of Directors after November 6, 1958. Of importance too, is the fact that none of these six directors, according to their own admission, had any knowledge or experience in the insurance business and had no working knowledge of the S. E. C. rules or policies. Tait was very active, as was his staff, in soliciting proxy votes from shareholders, a function generally reserved to management in corporate affairs.

The Court has given consideration likewise to the conduct of the parties in respect to the Distribution Agreement from the time it was signed until the suit was filed. The following events occurred:

November 24, 1958. Contract signed.

December 1, 1958. Prospectus issued.

January 12, 1959. Tait began sale.

January 23, 1959. Directors approved the hiring of person to search for existing insurance businesses to purchase.

April 3, 1959. Kroll announced to shareholders that negotiations for merger of Maryland Company into North American were completed.

April 26, 1959. Board of Directors approved the Purchase Agreement.

May 22, 1959. Shareholders ratified the merger action of the Board of Directors.

January 14, 1960. Tait received a letter from S. E. C., in re: Question of exemption of securities sold.

January 25, 1960. Tait discontinued sale after conference with S. E. C. until exemption clarified.

Between January 12, 1959 and January 25, 1960, the evidence shows that Tait sold 284,825 shares of stock of the Second Issue which is fifty-seven per cent of the total issue of 500,000 shares that Tait had a definite right to sell. The Contract gave the Company a right to withhold 450,000 shares of the 950,000 shares, but it is not determinable from the evidence what the Company was going to do under this clause.

Tait was present at the directors' meeting in January 1959, when the decision was made to employ a man to find an established insurance business, when Mark Kroll announced the negotiations for the merger of the Maryland Company to the shareholders meeting on April 3, 1959. Tait was present and witnesses attested to his enthusiasm with the purchase. In fact, witnesses testified that Tait had prior knowledge of the negotiations and he indicated that fact to various named directors at lunch before the meeting ("reserving the good news as to identification of the company to be acquired to Mark Kroll") and to Mr. Johnson (his salesman) several days prior to the announcement by Kroll. (Tait denies prior knowledge and asserts that it came to him as a complete surprise.)

Documentary evidence introduced by the defendant confirms the plaintiff's enthusiasm and support of the merger. The plaintiff justifies, excuses and rationalizes his conduct as a "sales tactic" and that his outward action had nothing to do with his disapproval of, and disagreement with the purchase. Tait was present at a Special Board of Directors Meeting which followed, when the Purchase Agreement of the Maryland Company was approved, and at the later Shareholders' Meeting when the directors' action was ratified. Dr. Swinehart testified that "when a shareholder from Dayton objected to the purchase ("he couldn't understand why we were using company funds to buy a company out of state at this time") Kroll turned the floor over to Tait and he answered the question and told him why this was necessary; "that it would be in the best interest of the company to acquire Independent Life, and would be, it would be quite a thing for our company."

Tait was registered with S. E. C. and was under its supervision and control (Bill of Exceptions, p. 173). All six of the men who were persuaded by Tait to serve as directors (a majority of the Board) were men who had no insurance company experience, nor any working knowledge of S. E. C. and men who stated that they had "great confidence in John Tait" and who were purchasers of their stock on the theory of the company development by the purchase of existing insurance companies. At no time did those men consider only Ohio companies for acquisition. They had no reason to as the matter had never been discussed with this restriction in mind. These six directors, a majority of the Board, were merely carrying into effect the corporate plan as presented to them by Tait. At no time was there ever any warning or word of caution by Tait or by anyone of authority, that their action may jeopardize the exempt classification of the Second Issue.

Tait was duty bound under S. E. C. requirements to be wary of any action which may effect the exempt status of the stock. At no time, from April 3, 1959, until the notice was received from S. E. C. did Tait ever indicate that there may be a need to register the Second Issue with S. E. C. because of the merger action taken by the defendant.

The plaintiff attached to his brief a Release from S. E. C.

dated December 6, 1961, styled by the S. E. C. as a "restatement of the principles underlying Section 3 (a) (II) as so expressed over the years and to facilitate an understanding of the meaning and application of the exemption." Under the sub-topic "Conclusion," and directed to issues in which there may be question as to their eligibility for exemption, the S. E. C. stated the following duty applicable to a dealer:

"* * * any dealer proposing to participate in the distribution of an issue claimed to be exempt under Section 3 (a) (II) should examine the character of the transaction and the proposed actual manner of its execution by all persons concerned with it with the greatest of care to satisfy himself that the distribution will not, or did not, exceed the limitations of the exemption.

"Otherwise the dealer, even though his own sales may be carefully confined to resident purchasers may subject himself to serious risk of civil liability * * * for selling without prior registration a security not in fact entitled to exemption from registration."

The Court recognizes that this statement is directed to the distribution of shares when contra to their local classification (and prior to the brokers acceptance of the distribution) but the fact remains that the S. E. C. places the responsibility upon the dealer to make this determination, and he is held to the "greatest of care" in this regard.

It follows that the security dealer should be constantly on the alert to factors in respect to the issue throughout its sale and the S. E. C. holds him to the greatest care in this respect. When the S. E. C. questioned the exempt status of the North American Second issue, they directed their inquiry and notice to Tait and not to the issuer. Tait in his petition alleges that North American's purchase of the Maryland Company classified the defendant in "Interstate Commerce" in that almost all of the insurance business was performed outside the state of Ohio, and thus rendered the issue he was selling non-exempt from S. E. C. Tait, as a dealer, was bound to the duty of discussing this point of dispute with the Board of Directors before it was put into effect and to point out to the issuer the possible effect on the sale.

Tait was exclusive agent for this stock issue. He created in the directors a feeling of confidence in him and spoke openly at all times to the directors and management, both in formal meetings and by personal contact. Tait's viewpoint was heavily considered by the directors of North American. When Tait urged that the Maryland Corporation pay a higher dividend after the merger, the directors followed his theory and declared a higher rate,—not as high as Tait recommended, but higher than any previous rate.

As stated earlier, Tait was registered with S. E. C. and it was his duty to speak up if there was any doubt that exemption from S. E. C. registration would be questioned or lost.

This Court has gone to great length to analyze the circumstances surrounding the creation of the Contract and the conduct of the parties under the Contract.

There are other facets of this case not discussed above, but the Court has discussed enough of the facts, circumstances and conduct of the parties to indicate the matters it considers pertinent to its decision. After giving proper weight to all the evidence herein, this Court concludes that there was no failure on the part of the Defendant to perform its promises under the Contract. In view of the undeniable intent of the parties when they entered into this Contract, the merging of the Maryland Company into the present Ohio Company was contemplated as a distinct possibility and probability by the parties when it was signed, not that the company would be a Maryland Company, but that under the organization planning "a company," whether domestic or foreign to Ohio was likely to be acquired.

The defendant through its Board of Directors did not create a situation that, from any viewpoint, could be construed as "wrongful" or "unlawful" conduct on their part, and contra to the anticipated plan that was evident when the Contract was executed by the parties. There existed no implied promise by the defendant that it would not purchase an out of state company. All parties knew the problems involved in acquiring insurance business and at various times during the trial statements were made that insurance policies (business) do not come into existence "overnight" or in a short period of time, and that the quickest and most economical way to accomplish this purpose was through the purchase of existing businesses,

It is difficult for this Court to comprehend that the parties believed the large capitalization of ten million dollars would be held for any period of time solely for intra-state business particularly since the planning was explicitly pointed to the other direction. The Court also attaches great weight to the evidence that Tait sold stock from January 12, 1959 to January 25, 1960, even though the merger was negotiated and approved approximately three months after he began sales of stock. In fact the evidence shows that Tait was awaiting the merger, and that he and his staff used the merger in their sales presentations to Tait's advantage. In a letter dated April 6, 1959, Tait wrote to Mr. Broderick, a salesman, and his chief assistant, the following:

"The news Mark (Kroll) gave us at the stock meeting has been eagerly awaited by all of us. * * * I want you to follow to the word the presentation which you will make in using it in your sales."

In a letter to stockholders, dated June 12, 1959, Tait said:

"We all have been eagerly awaiting the announcement of the completion of this transaction * * *. In our opinion, this acquisition has accomplished what would normally take a new insurance company five years to do * * *. We are presently increasing our sales staff in order to enter a number of new counties. This will speed up the capitalization of North American and enable your company to make further acquisitions as additional companies become available."

Tait explains his conduct as "just sales talk" when asked why he wrote the letter.

It is incomprehensible for the Court to believe that the plaintiff was merely "putting on an act" when he thus expressed his eagerness, enthusiasm and approval of the merger. This Court cannot clothe the plaintiff, as is his wish, with the protective veil of non-participation, helpless to do anything about the merger decision and disagreement with the merger, and disregard all the other phases of the situation.

In the interest of justice and truth this Court has pierced the veil and finds within it conclusive evidence of knowledge, cooperation, affirmation and active participation by the plaintiff to the very acts of the defendant that he alleges to be wrong.

ful, illegal, and contrary to the Contract between them. This Court rejects completely the plaintiff's contention that his non-participation in the merger in that he was neither a shareholder or a director is important to his position in the case.

Under the circumstances herein his continued presence and active participation in director and shareholder meetings was equivalent in the eyes of this Court to any legal participation through any official vote that the plaintiff could cast in the meetings. In fact, his participation was stronger than any vote he could cast in the meetings.

Another matter the Court would like to mention is the fact that S. E. C. had never released a decision prior to the filing of this action by the plaintiff concerning the exempt or non-exempt status of the issue. Stipulation B indicates that orally an S. E. C. staff attorney stated that "the distribution appeared to be in violation of the registration requirement of Section 5 of the Securities Act, and that 'intra-state' exemption of Section 3 (a) (II) of the Act did not appear to be applicable under the circumstances." The matter had been referred by the Chicago office of the S. E. C. to Washington for final decision, a decision not reached by S. E. C. prior to the filing of this action.

There had been discussion at various times concerning the registration fee in case the Second Issue had to be registered with S. E. C. The plaintiff contends that the fee was an obligation of the defendant, and the defendant contends that under Ohio law (Section 1707.32 Ohio Revised Code) the cost of the fee cannot be borne by it but has to be paid out of the fifteen per cent provision in the statute. In answer to an interrogatory the plaintiff did state that he agreed to pay it by asking the defendant to "prepay" it to S. E. C. and make the deduction of the cost from his fifteen per cent commission. Before a final decision was reached by S. E. C. on the exempt status of the issue, and before final agreement was effected by the parties concerning the payment of the S. E. C. fee for registration, if necessary, the plaintiff filed his petition.

It is the opinion of this Court that the plaintiff did not allow sufficient time before taking this course of action to allow the situation or problem to be fully resolved. The Court notes

that over twenty months remained under the Contract before the plaintiff was required to complete his sales effort. Further there was doubt whether plaintiff would have to sell the 450,000 shares which defendant had a right to withhold for its use. Therefore, even though the plaintiff's costs, according to his statements were supposedly breaking him financially, his obligation under these circumstances was to allow much more time for decision.

There were many problems before the defendant at one time (February 25, 1960) and the S. E. C. matter was but one of them. Management said they would get to it, but not immediately as the plaintiff demanded of them. It is this Court's opinion that the plaintiff precipitately instituted this action under the conditions existing at the time.

In the form of summation it is the opinion of this Court:

(1) Tait and North American entered into a Contract for the sale of the Second Issue with full knowledge that the purpose of the proceeds was primarily for the acquisition of existing insurance companies, whether located in Ohio or outside of Ohio.

(2) The Court has a right and a duty in construing the Contract to examine the circumstances surrounding the execution of the Contract and the conduct of the parties relative to the Contract.

(3) The Court finds that Tait, by his conduct before and after the execution of the Contract, was in full agreement and accord with the act of North American in its acquisition of the Maryland Insurance Company for the following reasons:

(a) Tait was present and a participant in discussion when North American capitalization policies were formulated.

(b) Tait sold stock under the plan thus agreed upon.

(c) Tait actively participated in all shareholder and director meetings; had prior knowledge of the Maryland Company merger before it was announced and concurred in the merger without opposition; for over nine months after the alleged breach of contract he sold stock, using the merger in his sales approach.

(4) A final decision concerning the status, exempt or non-exempt, of North American stock was never rendered by S. E. C. prior to the filing of this action by Tait.

572

(This Court has to consider the evidence relative to the status of S. E. C.'s decision at the time this action was commenced and cannot adjudicate the matter before the S. E. C. and declare whether the defendant by the merger act rendered the stock issue non-exempt.)

(5) North American did not breach the contract under the construction placed upon the contract by the court, as set forth in this opinion. The defendant's act of merging the Maryland Company was within the contemplation of the parties to the contract as proved by the surrounding circumstances when the contract was executed and the conduct of the parties under the contract.

(6) Tait agreed to pay the costs of registration with S. E. C. and North American agreed to register the stock, if necessary, and deduct the cost from future commissions due Tait.

The verdict of this Court is in favor of the Defendant. Costs are to be equally apportioned.

Please present entry accordingly.