**THE LINCOLN ELECTRIC COMPANY, Plaintiff,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, et al., Defendants.**

No. 1:96–CV–0537.

United States District Court, N.D. Ohio, Eastern Division.

May 11, 1998.

Robert S. Walker, Brian F. Toohey, Stephan Isaiah Voudris, Mark J. Andreini, Jones, Day, Reavis & Pogue, Cleveland, OH, Michael H. Ginsberg, Peter D. Laun, Jones, Day, Reavis & Pogue, Pittsburgh, PA, for Lincoln Elec. Co.

James C. Zacharski, Bethany K. Culp, Thomas P. Kane, Elliot M. Flies, Shannon B. Blair, Jonathan D. Jay, Oppenheimer, Wolff & Donnelly, St. Paul, MN, for St. Paul Fire and Marine Ins. Co. and St. Paul Companies, Inc.

William Andrew Hoffman, III, Friedman & Hoffman, Beachwood, OH, for W. Andrew Hoffman.

## FINDINGS OF FACT CONCLUSIONS OF LAW

GWIN, District Judge.

On April 13, 1998, this cause came on for trial before the Court, the parties having waived their right to a jury trial. After hearing the evidence and observing the demeanor of the witnesses, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Plaintiff Lincoln Electric Company ("Lincoln Electric" or "Lincoln") is an Ohio corporation with its principal place of business in Cleveland, Ohio. Lincoln manufactures welding equipment and welding products. Lincoln has been in that business since the early part of this century.

2. Defendant St. Paul Fire & Marine Insurance Company ("St.Paul") is a Minnesota corporation with its principal place of business in St. Paul, Minnesota. Defendant The St. Paul Companies, Inc. is a Minnesota corporation with its principal place of business in St. Paul, Minnesota. It is the successor by merger of St. Paul Mercury Indemnity Co. St. Paul has been selling and underwriting insurance policies since at least the 1940s.

3. In this case, Lincoln Electric claims that St. Paul breached its promises to pay for Lincoln Electric's defense of welding bodily injury claims and to indemnify Lincoln Electric for such claims. Lincoln Electric says St. Paul agreed to these responsibilities in comprehensive liability insurance contracts that St. Paul sold to Lincoln Electric before August 1, 1985. Lincoln Electric also claims that St. Paul breached duties of good faith, fair dealing and full disclosure by the method St. Paul used to allocate claims among insurance policies. St. Paul counterclaimed for a declaratory judgment, reformation, breach of contract, and rescission of certain policies.

4. Lincoln Electric purchased primary general liability insurance policies from St. Paul from at least 1945 until 1996.

5. In the pre–1965 policies, St. Paul agreed to "pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury, sickness, or disease, including death at any time resulting therefrom, sustained by any person." St. Paul further agreed to "defend any suit against the Insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false, or fraudulent . . . ."

6. In the policies from August 1, 1965, to July 31, 1973, St. Paul agreed that:

The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . bodily injury . . . to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit

against the insured seeking damages on account of such bodily injury ... even if any of the allegations of the suit are groundless, false or fraudulent.....

These policies define "bodily injury" as "bodily injury, sickness, or disease sustained by any person." These policies define "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

7. In the policies from August 1, 1973 to July 31, 1983, St. Paul agreed that:

The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... bodily injury ... to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury ... even if any of the allegations of the suit are groundless, false or fraudulent ...

These policies define "bodily injury" as "bodily injury, sickness, or disease sustained by any person." These policies define "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

8. In the policies from August 1, 1983, to July 31, 1985, St. Paul agreed to: "pay amounts you and others protected under this agreement are legally required to pay as damages for a covered bodily injury or property damage claim resulting from an accidental event." These policies define "bodily injury" as "any physical harm to a person's health including sickness or disease that happens while this agreement is in effect." St. Paul further agreed to "defend any suit brought against you or any other person for covered claims, even if the suit is groundless or fraudulent."

9. The occurrence policies for the period September 1, 1945, to August 31, 1952, included a $300,000 aggregate limit for bodily injury damages. These policies had no deductible for expenses. Policies for the period January 1, 1953 to July 31, 1965, included a $300,000 aggregate limit for bodily injury damages, a $100,000 per accident limit, a $5,000 indemnity deductible and no deductible for expenses. Policies for the period August 1, 1965, and renewals until April 10, 1969, included a $1,500,000 aggregate limit for bodily injury damages, a $1,000,000 per occurrence limit, a $5,000 indemnity deductible and no deductible for expenses. Policies for the period April 10, 1969 to July 31, 1979, included a $2,000,000 aggregate limit for bodily injury damages, a $5,000 indemnity deductible and no deductible for expenses.

10. The occurrence policies for the period August 1, 1979 to July 31, 1985, included a $2,000,000 aggregate limit for bodily injury damages, a $1,000,000 per occurrence limit, and a $25,000 combined indemnity and expenses deductible in welding fumes cases.

11. The claims-made policies for the period August 1, 1985, to July 31, 1987, included a $7,000,000 per event and total limit for all bodily injury or property damage, and a $50,-000 combined indemnity and expenses deductible in welding fumes cases.

12. The claims-made policies for the period August 1, 1987 to July 31, 1990, included a $6,750,000 per event and total limit for all bodily injury or property damage, and a $250,000 self-insured retention for combined indemnity and expenses in bodily injury claims, including welding fume claims.

13. The claims-made policies for the period August 1, 1990 to July 31, 1996, included a $5,000,000 per event and total limit for all bodily injury or property damage, and a $2,000,000 self-insured retention for combined indemnity and expenses in bodily injury claims, including welding fume claims.

14. Each of the policies from August 1, 1973 to July 31, 1985 contains a deductible.

15. The deductible endorsement for the August 1, 1979 to July 31, 1983 policies states, for each respective policy period:

In consideration of the Company agreeing to provide coverage to the Insured for this policy period, the Insured agrees to pay the following for: Bodily Injury Liability arising out of inhalation of toxic chemicals, including, but not limited to fumes and gases, which are caused from welding

products manufactured, sold, handled, or distributed by the Insured or the Insured's vendors on any and all claims first presented to the Company on or after August 1, 1979, regardless of when the claim first arose ... $25,000 deductible per claim applicable to the payment of the claim and allocated claims expense.

16. The $25,000 deductible for welding fumes cases presented to St. Paul after August 1, 1979, applied on a "per claim" or "each claim" basis. Under the policies, deductibles applied to all damages because of bodily injury sustained by any one person. Lincoln Electric was responsible for paying the first $25,000 of defense and indemnity costs.

17. The deductible endorsement for the August 1, 1983 to July 31, 1985 policies states, for each respective policy period:

> For bodily injury claims due to the breathing in of toxic chemicals, fumes, or gases coming from welding products manufactured, sold, handled, or distributed by you or your vendors your deductible is $25,000 each claim *for all claims reported after August 1, 1979.* This deductible amount applies to both the damages amount and the amount of expenses for handling the claim. (emphasis added).

18. In 1985, Lincoln and St. Paul agreed to a "claims-made" policy. In it, Lincoln assumed a greater portion of the cost associated with the defense. The claims-made policy differs from the occurrence coverage Lincoln previously purchased. The claims-made policy provides coverage if the "bodily injury" happens after the "retroactive date" and the claim is "first made" while the policy is in effect.

19. Each of the claims-made policies contains a "manifestation endorsement."

20. The manifestation endorsement provides that St. Paul would not cover claims first presented to St. Paul after August 1, 1985, if the claimant alleged bodily injury manifested before August 1, 1985.

21. The manifestation endorsement for the August 1, 1985 to July 31, 1987 policies states, for each respective policy period:

> The effect of this is to eliminate claims that should be covered under a previous policy. We won't cover claims for injury

arising out of inhalation of toxic chemicals, including but not limited to, fumes and gases which are caused by the use of welding products manufactured, sold, handled, or distributed by you or your vendors if the injury first manifested itself prior to 8/1/85. The date of manifestation shall be the date the person injured knew or should have known that the injury had occurred or the date is [sic] was medically diagnosed, whichever is earlier.

22. The manifestation endorsement for the August 1, 1987 to July 31, 1996 policies states, for each respective policy period:

> The purpose of this endorsement is to clarify what is covered under this policy. We won't cover claims for injury arising out of inhalation of toxic chemicals, including but not limited to, fumes and gases which are caused by the use of welding products manufactured, sold, handled, or distributed by you or your vendors if the date of manifestation of the injury or damage is prior to the retroactive date shown in the coverage summary. Date of manifestation means the earliest of the following dates: the date the person injured has knowledge of the injury, or the date the injury was medically diagnosed.

23. Lincoln Electric and St. Paul did not intend the manifestation endorsements to surrender Lincoln Electric's rights under the earlier occurrence policies.

24. St. Paul claims that modifications or surrenders needed to be in writing. Lincoln Electric never executed any surrender of its rights under the occurrence policies.

25. Even with the onset of the claims-made program, St. Paul allocated to an occurrence policy in effect at the time the claimant became symptomatic. Over the years, Lincoln assumed an increasing proportion of the risk through larger deductibles and self-insured retentions as an increasing number of claimants alleged that they became symptomatic after August 1, 1985.

26. In the claims-made policies from August 1, 1985 to July 31, 1996, St. Paul agreed, to "pay amounts any protected person is legally required to pay as damages for covered bodily injury ... that: happens on or

after the retroactive date [August 1, 1985]; and is caused by an event." These policies define "bodily injury" as "any harm to the health of other persons, including physical harm, sickness, disease and mental anguish, injury or illness. And it includes care, loss of services or death that results from such harm." These policies define "event" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." St. Paul further agreed to "defend any claim or suit for covered injury or damage made or brought against any protected person."

27. St. Paul sold all of its Lincoln Electric policies through The James B. Oswald Company ("Oswald"), an insurance agent headquartered in Cleveland, Ohio. Oswald is and has been a registered and licensed agent of St. Paul since 1907. Oswald is St. Paul's authorized representative in Ohio with the power to bind St. Paul to insurance contracts. Lincoln had a 49–year relationship with Oswald.

28. St. Paul and Oswald held themselves as experts in the insurance field. Lincoln Electric lacked such expertise. Lincoln was not a sophisticated insured with respect to the trigger, allocation and deductible insurance issues litigated in this case. Lincoln Electric relied on St. Paul and Oswald for advice on these issues.

29. At all times relevant to this case, St. Paul and Oswald had an incentive profit-sharing agreement under which Oswald was compensated based in part on St. Paul's claims history with Lincoln Electric's insurance policies.

30. Neither St. Paul nor Oswald disclosed to Lincoln Electric the incentive profit-sharing agreement between St. Paul and Oswald prior to this litigation.

31. Lincoln Electric knew that St. Paul paid its insurance agents based on commissions paid on sales to Lincoln Electric. Lincoln Electric Vice President, Ellis Smolik, did not care what the Oswald agency's commissions were. The incentive arrangement between Lincoln Electric and the Oswald agency was common in this insurance field.

32. Lincoln Electric employed a narrow layer of management given its sales, number of employees, and scope of operations. At pertinent times, Lincoln Electric did not employ a risk manager. No Lincoln Electric employee spent a majority of his or her time on risk functions. Lincoln Electric principally relied upon Oswald and, to a lesser degree, St. Paul for expertise in handling liability insurance.

33. From at least 1970 through 1985, the law firm of Jones, Day, Reavis & Pogue periodically advised Lincoln Electric on insurance and other legal matters. Senior members of Jones Day both advised Lincoln and served on Lincoln's board of directors. Lincoln's current Senior Vice President and General Counsel, Frederick Steuber, is a former Jones Day partner. In July 1979, Joanne Noonan of St. Paul sent a copy of Lincoln's then-current policy to David Gunning, a Jones Day lawyer. Two Jones Day lawyers accompanied Lincoln representatives to the August 15, 1979 meeting where the deductible agreement was negotiated. Michael Nims, another Jones Day attorney, also received copies of many letters from Lincoln to St. Paul concerning new welding fume and other product claims and related insurance coverage information. In early 1995, Jones Day began an investigation to determine whether St. Paul properly allocated expenses among various Lincoln Electric policies.

34. In the 1970s, plaintiffs began to sue Lincoln Electric alleging they suffered bodily injury due to asbestos contained in, or from breathing fumes generated by, Lincoln Electric's welding products. Typically, the plaintiffs' pleadings allege a continuous injury spanning decades. Lincoln was named a defendant in approximately 2,000 lawsuits. St. Paul did not dispute that its policies provided coverage for welding fumes cases.

35. St. Paul had the exclusive right to defend and settle these underlying cases at its own discretion, under terms of the applicable insurance contracts..

36. Among Lincoln Electric employees, executives Ellis Smolik and Harry Carlson had the greatest responsibility for insurance decisions. In discussions with St. Paul and the Oswald Agency, Mr. Carlson and Mr. Smolik sought additional control over litigation and settlement strategy. Lincoln Electric executives believed their products did

not cause asbestosis or manganese-related disability. Lincoln Electric executives wanted to defend vigorously welding fumes cases to discourage other potential claimants.

37. Lincoln Electric worked with other members of the so-called "welding industry defense group" to coordinate the defense of claims against Lincoln Electric and other manufacturers of welding rods. These companies coordinated their defense of these claims.

38. In the late 1970s, manufacturers such as Lincoln Electric experienced difficulty obtaining product liability insurance because underwriters faced uncertainty over their level of exposure.

39. On August 15, 1979, Lincoln Electric and St. Paul met to discuss the renewal of coverage and the control of litigation strategy in welding fumes cases. Lincoln Electric requested greater coverage under the occurrence policies. Lincoln Electric asked that coverage "read from the day the welder commences welding to day he ceases to be a welder." The parties were unable to reach agreement at this meeting. Thereafter, St. Paul proposed a $25,000 deductible and made it a part of the 1979–80 occurrence policy. On August 23, 1979, St. Paul wrote to Oswald and said:

> "We recognize a dispute in applications of limits and coverage for fumes cases exists. In keeping these issues as status quo and without prejudice to either party on this position, the attached endorsement has been drafted in an effort to clearly indicate our intention on future reported cases if we are to remain with this risk."

40. At the August 15, 1979 meeting, Lincoln Electric requested more input in defending and settling welding fumes cases. Representatives of St. Paul agreed to consult with Lincoln Electric on litigation strategies, but St. Paul retained ultimate authority over defending settling welding fumes cases.

41. Each of the occurrence policies St. Paul sold Lincoln Electric from 1979 until

July 31, 1985 had a $25,000 deductible endorsement.

42. Each of the occurrence policies issued to Lincoln Electric before 1979 included policy language requiring that any change or amendment to the policies be in writing. For instance, under the "Conditions" section of St. Paul's policies,—captioned "changes," the policies state:

> Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Policy or estop the Company [St. Paul] from asserting any right under the terms of this Policy; nor shall the terms of this Policy be waived or changed, *except by endorsement issued to form a part of this Policy.* (emphasis added).[1]

St. Paul drafted this language. In 1979 and thereafter, Lincoln Electric did not agree to any endorsement giving up any of its rights under its pre–1979 policies.

43. St. Paul fails to show that in 1979 Lincoln Electric was fully aware of, and fully understood, the nature and extent of Lincoln's contractual rights under the pre–1979 occurrence policies. St. Paul fails to show "clearly, unequivocally and decisively" that Lincoln Electric voluntarily and knowingly relinquished those contractual rights for the purpose of permanently abandoning those rights.

44. Lincoln Electric and St. Paul never reached agreement on the appropriate trigger of coverage. Lincoln Electric reserved and did not waive any of its rights under any of the policies.

45. After the August 1, 1979 renewal, Lee Guillory made a welding fume claim against Lincoln. Lincoln Electric reported the claim to St. Paul near September 1979. The claim alleged that Guillory was exposed to Lincoln's welding rods for a period of "many years." In 1981, St. Paul settled the Guillory claim. The cost of the settlement and the defense expenses exceeded $25,000. St. Paul sent two bills to Ellis Smolik totaling of

---

1. See St. Paul's comprehensive general liability policies revised March 1956, October 1958, October 1960, January 1962, April 1962, and November 1963. Many of the pre–1963 policies required that the written endorsement be "signed by the President, Vice–President, Secretary or Assistant Secretary of the Company." In later policies, the requirement of a written endorsement was set forth in ¶ 8 of the "Conditions" section.

$25,000. Lincoln Electric paid the $25,000 deductible.

46. Lincoln paid $25,000 deductible amounts on claims presented to St. Paul on or after August 1, 1979, even though the majority of those claims alleged exposure to welding fumes prior to August 1, 1979.

47. In August 1, 1979 binder issued by Oswald to Lincoln Electric, Oswald characterized the $25,000 deductible as "retroactive." Lincoln Electric did not protest these deductibles from 1979 until 1996.

48. St. Paul presented no credible evidence that Lincoln Electric understood the application of the deductible to claims made after August 1, 1979, involving allegations of exposure before August 1, 1979. On May 13, 1986, Oswald Chairman, James Pender, wrote St. Paul. He recommended that '[t]he date of the as well as the applicable deductible should be indicated ($5,000? $20,000 $25,-000 $50,000 ?).' Pender also suggested:

As respects a 'meeting of the minds,' I do not understand the situation and I am confident Lincoln does not either. There are some big dollars here and it is essential that we avoid a misunderstanding. Let's get our position clarified so we can get out to communicate to Lincoln on this subject a.s.a.p.

Pender also wrote that no meeting of the minds existed on eliminating deductibles applicable to earlier occurrence policies.

49. Former St. Paul underwriter, George Tsui, testified credibly that modifying or eliminating coverage under a policy previously issued requires consideration be given to the insured. Tsui testified that St. Paul gave no consideration to support any agreement to eliminate or modify Lincoln Electric's coverage under earlier policies. Tsui also testified that the only way St. Paul could stop liability under the older occurrence policies was through "buy[ing] the policies back by giving the insured some consideration."

50. At the August 1, 1985, renewal, Lincoln Electric changed to a claims made policy. Based upon the manifestation date, the new 1985 deductible endorsement purported to allocate claims to an occurrence or claims made policy.

51. Over the years, beginning in 1987 and continuing through at least 1996, St. Paul sent Lincoln a deductible recovery billing. These billings were addressed to Mr. Smolik but typically were handled by Mr. Cline. These billings contained deductible recovery billing letters fore each claimant. They identified the report date for each claim, the deductible St. Paul charged and the amount of the deductible that St. Paul or Lincoln had charged or been paid for their respective losses or expenses. Each letter also specified the remaining portion of the deductible that Lincoln Electric owed to St. Paul on each claim.

52. Mr. Cline signed Lincoln's "Request for Check" forms indicating the amount of the payment owed to St. Paul in connection with this process.

53. Lincoln employed both internal and external auditors to review the deductible billing process. Lincoln Electric had copies of deductible billing records available for auditors to review.

54. The manifestation endorsement to the claims-made policies did not purport to, and did not in fact, affect Lincoln Electric's right to defense or indemnity coverage under any prior policies. Raymond McMahon, St. Paul's senior underwriter who drafted the manifestation endorsement, testified:

Q. . . . [D]o you think the claims-made policies don't have to provide coverage or the occurrence-based policies don't have to provide coverage?

A. The occurrence-based policy provides coverage regardless of whether there's a claims-made policy or not.

\*   \*   \*   \*   \*   \*

Q. And my question to you was, it was your understanding after that endorsement was entered into, or put into Lincoln's policies, that it did not resolve the situation that both pre–1985 occurrence-based policies and post–1985 claims-made policies could be required to respond in the situation where there was an occurrence in the form of bodily injury during the earlier policies and a claim made in the post-August 1st, 1985, claims-made policies, correct?

A. If the injury hadn't manifested itself prior to August 1, 1985, my recollection of that endorsement is that it didn't say one way or the other claim.

\* . \* \* \* \* \*

Q. . . . It was your understanding that the endorsement set forth on Deposition Exhibit 8 would not have any effect on coverage that may have existed under earlier occurrence based policies, correct?

\* \* \* \* \* \*

A. Yeah, this endorsement does not affect prior occurrence policies.[2]

\* \* \* \* \* \*

55. Beginning in the late 1970s, Lincoln Electric expressed interest in taking on more risk through lower aggregates, higher deductibles and self-insured retentions with welding fume cases.

56. In 1987, George Tsui and other St. Paul representatives met with Lincoln Electric representatives. In these meetings, Tsui and St. Paul sought to change the occurrence language of the current policy. However, no agreement was reached regarding St. Paul's effort to change the occurrence language.

57. Lincoln Electric did not surrender any rights to coverage under any prior policies when it purchased the claims-made policies. On May 1, 1985, St. Paul Underwriter Ray McMahon reflected such when he wrote: "The principle advantage to us [of later claims made policies] would be to stop adding to the potential accumulation of liability limits that the exposure theory makes possible." At trial, Mr. McMahon testified that when there was exposure before 1985, but a "claim made after August 1st of 1985," there was potential coverage under both the claims made policies and the earlier occurrence policies.

58. The occurrence policies state that they can be modified or changed only with a written endorsement attached to the affected policies. The Court finds that St. Paul did not issue any such written endorsements

purporting to change the deductibles to the pre–1979 policies, nor did Lincoln Electric agree to any such endorsements.

59. St. Paul generally modified coverage through written endorsements that the insured signed and accepted. As a matter of procedure, St. Paul did not use endorsements in one policy to modify coverage in another policy.

60. On other occasions, St. Paul tendered policy releases on other coverages and Lincoln Electric executed such releases when they intended to remove coverage from a policy. The Court finds that St. Paul never sent and Lincoln Electric never executed policy releases on relevant occurrence-based policies.

61. The Court also finds that Lincoln Electric has performed each condition precedent required under the occurrence and claims-made policies. As such, Lincoln Electric is entitled to receive the benefits of policy coverage.

62. The occurrence policies are still in full force and effect to the extent that their respective policy limits have not been exhausted.

63. From the 1970s until August 1, 1996, Lincoln Electric paid virtually all related defense costs, settlements and judgments arising from welding fumes cases. When allocating claims, St. Paul chose the policy as to which a claim should be applied.

64. St. Paul did not use a consistent methodology in allocating claims to insurance policies. In determining which insurance policy or policies applied to a particular lawsuit, St. Paul generally followed the criteria below:

(a) If the injury's manifestation date (which St. Paul defined as the earlier of the date the person injured has knowledge of the injury or the date the injury was medically diagnosed) was before August 1, 1985, St. Paul applied the terms, limits and

---

2. See also testimony of Jack Baker:

Q. Now the policy number shown in the upper left-hand corner, 534JG0699, would it be your understanding that this endorsement would apply to that policy?

A. Um-hum.

Q. And would it be also your understanding that it would not apply to any policy the number of which is not listen in that blank space?

A. That would be my opinion, yes.

deductibles of the primary occurrence policy that provided coverage for that date; (b) If the manifestation date was on or after August 1, 1985, St. Paul applied the terms, limits and deductibles (or self-insured retention) of the primary claims-made policy that provided coverage for the date that the claim was made.

St. Paul unilaterally applied a $25,000 deductible for all welding fumes claims filed on or after August 1, 1979, irrespective of which policies were triggered.

65. The effect of St. Paul's method was to allocate claims triggered under more than one policy to the most recent policy. This often resulted in an increased deductible and in Lincoln Electric bearing the expense of the claim.

66. St. Paul defended all welding fume claims Lincoln reported prior to August 1, 1996. On that date, Lincoln's general liability coverage with St. Paul expired. Lincoln Electric largely funded the cost of defending its welding fumes litigation.

67. Since August 1, 1996, St. Paul has refused to defend or acknowledge coverage for welding fumes cases triggering coverage under occurrence policies.

68. During 1995, Lincoln Electric began to examine its insurance program and its relationship with St. Paul. Lincoln Electric initiated a serious review of a potential legal action against St. Paul in the Fall of 1995.

69. Lincoln Electric raised the issue of claims allocation with St. Paul's agent Oswald in late 1995 and early 1996. Oswald recommended that Lincoln Electric negotiate directly with St. Paul. Oswald contacted several St. Paul executives on February 21 and 22, 1996.

70. On February 22, 1996, Lincoln Electric faxed a letter to St. Paul formally requesting reimbursement for monies Lincoln Electric believed it was owed. The letter also notified St. Paul that Lincoln Electric was prepared to file an action, if necessary. Lincoln enclosed with the letter a draft "Standstill Agreement" proposing a 60–day stay before commencing litigation. The Standstill Agreement provided Lincoln first choice of venue for any later litigation over these issues. Later that day, St. Paul contacted Lincoln to acknowledge receipt of the letter.

71. Lincoln Electric's counsel prepared a first draft of a complaint after forwarding its demand for adjustments to St. Paul.

72. St. Paul made no representation that it would avoid filing suit. St. Paul made clear to Lincoln its preference for filing suit in Minnesota.

73. On March 11, 1996, St. Paul filed suit against Lincoln Electric in St. Paul's home forum of Minnesota. In response, Lincoln immediately filed suit against St. Paul in this Court. Before filing the Minnesota action, St. Paul had not disclosed to Lincoln that it intended to file a lawsuit in Minnesota or elsewhere.

74. The 1995–96 claims-made policy gave St. Paul the right to cancel the policy with 60 days' notice after discovery of "fraud" in the application. St. Paul did not attempt to cancel the 1995–96 policy within 60 days of Lincoln Electric's February 22, 1996 letter, or anytime thereafter.

CONCLUSIONS OF LAW

1. The substantive law of the State of Ohio governs this case.

2. This court has jurisdiction over this case under 28 U.S.C. § 1332(a). Venue is proper under 28 U.S.C. § 1391.

3. To prevail against St. Paul for breach of an insurance policy, Lincoln must prove by a preponderance of the evidence that: (a) a valid and enforceable contract of insurance existed between Lincoln Electric and St. Paul; (b) Lincoln Electric satisfied its obligations under the insurance contract; (c) St. Paul failed to pay Lincoln Electric the proper amounts for defense and indemnity costs required to be paid under the policies; and (d) as a proximate result of St. Paul's breach of contract, Lincoln Electric suffered damages.

4. Defendant The St. Paul Companies, Inc. is not an insurance company. The St. Paul Companies, Inc. is a holding company, the parent corporation to St. Paul Fire & Marine Insurance Co. The Court finds no evidence supporting claim against The St. Paul Companies, Inc. The Court gives judg-

ment to The St. Paul Companies, Inc. and dismisses it as a defendant in this case.

5. An enforceable insurance contract existed between Lincoln Electric and St. Paul from as early as 1973 to 1985, that provided coverage for bodily injury liability. Lincoln Electric satisfied all of its obligations under those policies. As to occurrence policies in effect from 1973 until 1985, the first two elements of Lincoln Electric's breach-of-contract claim are established.

■ 6. Lincoln Electric and St. Paul dispute the extent to which St. Paul sold policies to Lincoln Electric between 1945 and 1973. Lincoln Electric must prove by a preponderance of the evidence the existence of coverage it may have under any "lost" policies. Lincoln can satisfy this burden by coming forward with secondary evidence of the existence and basic contents of a lost policy. *J.T. Baker Chem. Co. v. Aetna Cas. & Sur. Co.*, No. 86–4974 (JEI), 1996 WL 451316, 1996 U.S. Dist. LEXIS 11600 at *17–20, 46–48 (D.N.J. Aug. 5, 1996) (requiring insured to prove the terms and conditions of the lost policies by a preponderance of the evidence).[3]

7. Lincoln Electric sufficiently established the existence and contents of pre–1973 policies. Their provisions are such that the Court's analysis of the pertinent coverage issues is the same with respect to those policies as it is for the more recent occurrence policies.

8. In Ohio, insurance contracts must be construed under the same rules as other written contracts. *Affiliated FM Ins. Co. v. Owens–Corning Fiberglas Corp.*, 16 F.3d 684 (6th Cir.1994) (citations omitted). The intent of parties to a contract is presumed to reside in the language of the contract itself. In interpreting these policies, the Court must look first and primarily to the express terms and conditions found on the face of the policies. *Id.* See also *Universal Underwriters*

*Ins. Co. v. Shuff,* 67 Ohio St.2d 172, 423 N.E.2d 417 (1981); *Skivolocki v. East Ohio Gas Co.,* 38 Ohio St.2d 244, 247, 313 N.E.2d 374 (1974); *Blosser v. Enderlin,* 113 Ohio St. 121, 148 N.E. 393 (1925) (syllabus ¶ 1).

9. Ohio case law also follows the central cannon of insurance contract construction wherein language "reasonably susceptible of more than one meaning will be construed liberally in favor of the insured and strictly against the insurer." *U.S. Fidelity & Guar. Co. v. Lightning Rod Mut. Ins. Co.,* 80 Ohio St.3d 584, 586, 687 N.E.2d 717 (1997); *State Farm Mut. Ins. Co. v. Blevins,* 49 Ohio St.3d 165, 551 N.E.2d 955 (1990). Here, the insurance policy is construed in favor of Lincoln Electric.

10. If the language of the policy's provisions is clear and unambiguous, a court may not "resort to construction of that language." *Karabin v. State Auto. Mut. Ins. Co.,* 10 Ohio St.3d 163, 167, 462 N.E.2d 403 (1984). See also *Schaefer v. Allstate Ins. Co.,* 76 Ohio St.3d 553, 668 N.E.2d 913 (1996).

11. Where the wording of an insurance contract or policy is doubtful or ambiguous, the fact-finder must interpret the contract. *Potti v. Duramed Pharmaceuticals, Inc.,* 938 F.2d 641, 647 (6th Cir.1991).

■ 12. St. Paul bears the burden of establishing the applicability of all exclusions or other policy limitations that St. Paul contends bar or reduce coverage for fumes claims under Lincoln Electric's policies. *Continental Ins. Co. v. Louis Marx & Co.,* 64 Ohio St.2d 399, 401, 415 N.E.2d 315 (1980).[4]

■ 13. Exclusionary Policy language will be treated as an exclusion even if the insurer characterizes the provision differently. See *Physicians Ins. Co. v. Swanson,* 58 Ohio St.3d 189, 191, 569 N.E.2d 906 (1991).

■ 14. An insurer can prove that an exclusion or limitation bars coverage only if

---

3. *See also Cooper Indus., Inc. v. Liberty Mut. Ins. Co.,* No. H–91–3158, Mem. Op. & Order at 4–5 (S.D.Tex. Jan. 4, 1994); *Remington Arms Co. v. Liberty Mut. Ins. Co.,* 810 F.Supp. 1420, 1426 (D.Del.1992) (reasoning that the preponderance of the evidence standard is the more appropriate standard in the context of commercial environmental insurance contracts since the higher clear and convincing standard is not necessary unless preventing fraudulent claims).

4. *See also St. Paul Mercury Ins. Co. v. Capital American Life Ins. Co.,* No. 1:90–CV–1357, slip op. at 7, 12 (N.D.Ohio Jan. 6, 1992); *Burroughs Wellcome Co. v. Commercial Union Ins. Co.,* 632 F.Supp. 1213, 1223 (S.D.N.Y.1986) (stating that insurer has burden of proving limits of liability in "lost" policy); *McFadden v. Elmer C. Breuer Transp. Co.,* 156 Ohio St. 430, 433, 103 N.E.2d 385 (1952); *MatchMaker Int'l, Inc. v. Long,* 100 Ohio App.3d 406, 408, 654 N.E.2d 161 (1995).

it can show that it is more likely than not that: (1) there is only one reasonable construction of the provision; and (2) that construction is the insurer's and not the insured's. *U.S. Fidelity & Guar. Co.*, 80 Ohio St.3d at 586, 687 N.E.2d 717 (1997).[5]

■ 15. Any limitation on what would otherwise be broad coverage in general liability policies must be "clear and exact" to be given the effect when drafted by the insurer. Thus, exclusions that the insurer has not proved are "clear and exact" on their face cannot bar or limit coverage. *U.S. Fidelity & Guar. Co.*, 80 Ohio St.3d at 586, 687 N.E.2d 717; *Lane v. Grange Mut. Companies*, 45 Ohio St.3d 63, 65, 543 N.E.2d 488 (1989).[6]

16. To show that St. Paul breached the terms of a particular policy, Lincoln Electric must prove that St. Paul failed to pay Lincoln Electric the full amounts as the policies require for the costs of defending, settling or paying any judgment on a particular welding fume claim.

■ 17. An occurrence policy is "triggered" by any welding fume claim when the claimant suffered some "bodily injury" during the policy period. Such "bodily injury" occurred at any point along the continuum of injury from the claimant's initial exposure to welding fumes until diagnosis of the claimant's injury, sickness, illness or disease or death. *Keene Corp. v. Ins. Co. of No. America*, 667 F.2d 1034 (D.C.Cir.1981) (Bazelon, J.), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982).

■ 18. For purposes of asbestos-related diseases, "bodily injury" should be interpreted to mean any part of the single injurious process that asbestos-related diseases entail. *Keene*, 667 F.2d at 1046. Further, manifestation of the disease, inhalation exposure, and exposure in residence will trigger policy coverage. *Id.*[7]

19. Under Ohio law, it is clear that an insurer has a direct duty to defend its insured when the terms of an insurance policy so provide. *City of Willoughby Hills v. Cincinnati Ins. Co.*, 9 Ohio St.3d 177, 459 N.E.2d 555 (1984). The duty to defend arises solely under contract. An insurer contracts with an insured to pay the entire cost of defending claims which arise within the policy period. *Insurance Co. of No. America v. Forty-Eight Insulations*, 633 F.2d at 1212, 1224 (6th Cir.1980), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981).

■ 20. An insurer normally has no obligation to pay defense costs for occurrences not within policy periods. However, "an insurer must bear the entire cost of defense when 'there is not reasonable means of prorating the costs of defense between the covered and the not-covered items.'" *Id.* (citations omitted).

■ 21. St. Paul's duty to defend and indemnify is triggered at any point along the continuum of injury from the claimant's initial exposure to diagnosis or death. *Owens–Corning Fiberglas Corp. v. American Centennial Ins. Co.*, 74 Ohio Misc.2d 183, 210–15, 660 N.E.2d 770 (Ohio Com.Pl.1995) (discussing *Keene*, 667 F.2d at 1034).[8] Generally,

---

**5.** See also *St. Paul Fire & Marine v. MetPath*, No. 3–96–703, 1998 U.S. Dist. LEXIS 2264 at *19 (D.Minn. Jan. 26, 1998) (construing exclusion against St. Paul even though "each side ha[d] advanced a reasonable interpretation of the exclusion"); *River Servs. Co. v. Hartford Acc. & Indem. Co.*, 449 F.Supp. 622, 626 (N.D.Ohio 1977).

**6.** See also *St. Paul Mercury Ins. Co. v. Capital American Life Ins. Co.*, No. 1:90–CV–1357, slip op. at 7, 12 (N.D.Ohio Jan. 6, 1992) (construing ambiguous exclusion against St. Paul).

**7.** In *Keene*, Judge Bazelon reasoned that "to hold that only the manifestation of disease can trigger coverage ... would undermine the function of the insurance policies." *Id.* at 1046. In this regard, Bazelon noted concern that policyholders

should reasonably expect to be covered for past, present and future liability, where such policyholders knew of and took steps to protect themselves from risk. *Id.* at 1044. See also *Insurance Co. of No. America*, 633 F.2d at 1220 ("A manifestation rule [alone] would deny coverage to insured manufacturer. Moreover, it is the injury and not its discovery that makes the manufacturer liable in the underlying tort suit.").

**8.** In *Owens–Corning*, the court stated that the "continuous injury process begins with some injury to the body, however minute, at the point of initial exposure." *Id.* at 212, 660 N.E.2d 770. See also *ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 764 F.2d 968 (3rd Cir.1985) (same); *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974) (holding that each

whether the duty is invoked is determined by reviewing the allegations of a complaint to see if the action is brought within the ambit of the coverage of the policy. *Id.* at 179, 459 N.E.2d 555. See also *Sanderson v. Ohio Edison Co.*, 69 Ohio St.3d 582, 585–86, 635 N.E.2d 19 (1994).[9]

■ 22. With regard to allocating a particular fumes claim to specific "triggered" occurrence policies, Lincoln Electric is entitled to select that triggered policy which will pay all of Lincoln Electric's defense costs in a particular case. *Owens–Corning*, 74 Ohio Misc.2d at 217–19, 660 N.E.2d 770 (discussing how Ohio courts refuse to allow insurers to assign a "liability" portion to policies with higher deductibles or self-insured retentions through "other insurance" clauses).[10]

■ 23. In cases where coverage is triggered under more than one policy, the logical resolution is to allow the insured to collect the full amount of indemnity due from any triggered policy. This is "subject only to the provisions in the policies that govern the allocation of liability when more than one policy covers an injury." See *Keene*, 667

F.2d at 1050 (discussing allocations of liability).

24. An insurer's duty to defend its insured in this regard is separate and distinct from the duty to indemnify. *Id.* at 586, 635 N.E.2d 19. Moreover, the duty to defend is typically broader than the duty to indemnify. *Willoughby*, 9 Ohio St.3d at 180, 459 N.E.2d 555.[11]

25. The allegations contained in a welding-fume tort complaint control St. Paul's duty to defend Lincoln Electric under the occurrence policies. *Willoughby*, 9 Ohio St.3d at 179, 459 N.E.2d 555. St. Paul must defend welding fumes cases against Lincoln Electric whenever the allegations in the underlying fumes complaint bring the action potentially or arguably within the scope of the policy's coverage, or when "there is some doubt as to whether a theory of recovery within the policy coverage had been pleaded." *Stychno v. Ohio Edison Co.*, 806 F.Supp. 663, 670–71 (N.D.Ohio 1992).

■ 26. St. Paul's duty to defend Lincoln Electric under an occurrence policy is

manufacturer who contributed in anyway, and at any time, to a claimant's bodily injury is fully liable for all the resulting damages); *Owens–Illinois, Inc. v. Aetna Cas. & Sur. Co.*, 597 F.Supp. 1515 (D.D.C.1984); *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29, 626 A.2d 502 (1993).

9. In *Sanderson v. Ohio Edison Co.*, 69 Ohio St.3d 582, 586, 635 N.E.2d 19 (1994), the Ohio Supreme Court reiterated the importance of the duty to defend, stating:

   "The duty to defend is of great importance to both the insured and the insurer" ... Thus, the insurer's failure to honor that obligation constitutes a material breach of the contract. This material breach relieves the insured of the duty to seek the insurer's assent to and participation in a proposed settlement.

   *Id.* at 586, 635 N.E.2d 19 (quoting *Hartford Acc. & Indem. Co. v. Randall*, 125 Ohio St. 581, 183 N.E. 433 (1932)).

10. See also *Keene*, 667 F.2d at 1050; *Ins. Co. of No. America*, 633 F.2d at 1223–25; *Owens–Illinois v. Aetna*, 597 F.Supp. 1515, 1524 ("[O]nce triggered, a policy provides coverage for [insured's] full liability according to its terms without any proration of that liability to [the insured]."); *Sherwin–Williams Co. v. Certain Underwriters at Lloyd's London*, 813 F.Supp. 576, 590 n. 9 (N.D.Ohio 1993) (refusing to allow insurers to allocate defense costs

among multiple triggered policies or to insured for underlying product liability cases); *Detrex Chem. Indus. Inc. v. Employers Ins. of Wausau*, 746 F.Supp. 1310, 1325–26 (N.D.Ohio 1990); *Commercial Cas. Ins. Co. v. Knutsen Motor Trucking Co.*, 36 Ohio App. 241, 245, 173 N.E. 241 (1930) (stating where multiple policies are triggered, each insurer is jointly and severally liable).

11. In *Willoughby*, the Ohio Supreme Court described the scope of an insurer's duty to defend as being favorable to the insured, especially where from the pleadings, the duty may not seem apparent. The court stated:

   [W]here the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage had been pleaded, the insurer must accept the defense of the claim. Thus, the "scope of the allegations" may encompass matters well outside the four corners of the pleadings.

   *Id.* at 180, 459 N.E.2d 555. See also *Stychno v. Ohio Edison Co.*, 806 F.Supp. 663, 671 (N.D.Ohio 1992); *Sanderson*, 69 Ohio St.3d at 586, 635 N.E.2d 19; *Motorists Mut. Ins. Co. v. Trainor*, 33 Ohio St.2d 41, 294 N.E.2d 874 (1973).

triggered even if the fumes tort complaint does not mention the specific dates when the plaintiff was allegedly injured. Rather, the allegations in the complaint alone are construed as raising the potential for triggering an occurrence policy's effective period. *Sherwin–Williams,* 813 F.Supp. at 586; *St. Paul Mercury Ins. Co. v. Capital American Life Co.,* No. 1:90–CV–1357, slip op. at 13–14 (N.D.Ohio Jan. 6, 1992).

■ 27. Furthermore, St. Paul must defend the entire fumes action when the underlying fumes complaint states a claim partially or arguably within the scope of coverage. *Sanderson,* 69 Ohio St.3d at 582, 635 N.E.2d 19. In *Sanderson,* the court stated:

> An insurance policy which states that the insurer is obligated to defend in any action seeking damages payable under the policy against the insured, even where the allegations are groundless, false, or fraudulent, imposes an absolute duty upon the insurer to assume the defense of the action where the complaint states a claim which is partially or arguably within policy coverage. *Id.* at 582, 635 N.E.2d 19 (syllabus ¶ 1).[12]

28. The only predicate triggering the duty to defend is a welding fume claim against Lincoln Electric alleging bodily injury. Thus, if the underlying fumes complaint alleges that Lincoln Electric's welding equipment or products exposed the plaintiff to

fumes during the period of the particular policy and that the plaintiff subsequently developed a disease as a result, the duty to defend is triggered.[13] In such fumes cases, St. Paul must defend Lincoln Electric under the policy Lincoln chooses, if the claim can fairly be interpreted as alleging exposure during the policy term.

29. Although Ohio law favors construing the duty to defend strictly against the insurance provider, an insurer may have no duty to defend if the insured either breached the insurance contract or misrepresented material facts to the insurer in making application for coverage. *Sherwin–Williams Co. v. Certain Underwriters at Lloyd's London,* 813 F.Supp. 576, 582 (N.D.Ohio 1993).[14] An insurer may also find relief when it can disprove policy coverage or, if after notice to the insured of reservation of rights, the insurer later discovers that the claim does not warrant policy coverage. *Willoughby,* 9 Ohio St.3d at 178, 459 N.E.2d 555 (citations omitted).

30. After observing the demeanor of the witnesses, the Court concludes that St. Paul failed to prove that the parties intended the 1979–1985 deductible endorsements to apply to or affect pre–1979 policies. Those endorsements are clear and specific on their face and do not apply to prior policies. Even if the endorsements were susceptible of St.

---

**12.** *See also Sherwin–Williams,* 813 F.Supp. at 585; *State Farm Fire & Cas. Co. v. Hiermer,* 720 F.Supp. 1310, 1313 (S.D.Ohio 1988), *aff'd,* 884 F.2d 580 (6th Cir.1989) (stating that an insurer that is obligated to defend a negligence claim is also required to defend a gainst intentional tort claims); *City of Willoughby Hills,* 9 Ohio St.3d at 179, 459 N.E.2d 555; *Socony–Vacuum Oil Co. v. Continental Cas. Co.,* 144 Ohio St. 382, 59 N.E.2d 199 (1945); *U.S. Fire Ins. Co. v. St. Paul Fire & Marine Ins. Co.,* 31 Ohio App.3d 270, 272, 511 N.E.2d 127 (1986)(stating where claims for defamation and invasion of privacy were potentially covered, "St. Paul should have appeared and defended the action."); *Grand River Lime Co. v. Ohio Cas. Ins. Co.,* 32 Ohio App.2d 178, 289 N.E.2d 360 (1972) (following *Socony–Vacuum* ).

**13.** *See Keene,* 667 F.2d at 1046 (stating: "regardless of whether exposure to asbestos causes an immediate and discrete injury, the fact that it is part of an injurious process is enough for it to constitute "injury" under the policies.").

**14.** In *Sherwin–Williams, supra,* Judge Battisti discussed when an insurer would not be obliged to defend a claim. He stated:

> The scope of the allegations test does not place an absolute duty on an insurer to defend its insured. If none of the claims in a complaint against the insured are arguably or potentially within the scope of the insurer's policy, then the insurer obviously has no duty to defend. *Wedge Products, Inc. v. Hartford Equity Sales Co.,* 31 Ohio St.3d 65, 509 N.E.2d 74 (1987). A claim may fall outside the scope of a policy either because the policy does not provide coverage for a particular type of loss, because the policy was not in effect at the time of the accident or occurrence forming the basis for the claim, or because the claim falls within one of the exclusionary clauses found in the policy. Even if the one of the claims is within the scope of the policy, an insurer may have no duty to defend if the insured breached the insurance contract or if the insured misrepresented material facts to the insurer in making its application for coverage. *Id.* at 583.

Paul's interpretation, St. Paul has not proved that its interpretation is the only reasonable one. The pre–1979 policies also expressly allow for changes only by subsequent written endorsement to each of those policies. St. Paul never issued any such endorsements explicitly modifying coverage under the former policies. Lincoln Electric never signed any endorsement explicitly modifying coverage under the former policies.

31. The 1985–96 manifestation endorsements must be treated as exclusions from coverage which St. Paul has the burden of proving were incorporated into pre–1985 policies and thereby apply to welding-fume claims that Lincoln Electric seeks to allocate to those policies. St. Paul has not proved that the parties intended the post–1985 manifestation endorsements to apply retroactively to the pre–1985 policies. The pre–1985 policies expressly allow for changes or waiver only by written endorsement to each of those policies. St. Paul never issued any such endorsements.

32. The Court also finds that St. Paul has not proved that the parties ever agreed to a manifestation trigger for the pre–1979 non-claims-made policies. St. Paul has produced no credible evidence that the parties intended such an agreement.

33. In the instant case, the Court finds no evidence to relieve St. Paul of its duty to defend Lincoln Electric. Accordingly, St. Paul is obligated to defend and indemnify Lincoln Electric under the insuring agreements of the occurrence policies to the extent that such claims contain an allegation that exposure to fumes happened during a policy's term or the claims can fairly be interpreted as alleging exposure during the policy's term.

34. Under Ohio law, an insurance broker is an agent for the insurance company. Ohio Revised Code § 3929.27 provides:

A person who solicits insurance and procures the application therefor shall be considered as the agent of the party, company, or association thereafter issuing a policy upon such application or a renewal thereof, despite any contrary provisions in the application or policy.

35. An agent generally cannot serve two principals whose interests are incompatible and he cannot properly serve both parties to a contract so long as the duties are inconsistent. *General Acquisition, Inc. v. GenCorp., Inc.*, 766 F.Supp. 1460, 1469 (S.D.Ohio 1990).[15] However, the agent may act as a dual agent for principals to both sides on a transaction with full disclosure to, and consent from, each of the agent's principals. *Id.*

36. Dual agencies are generally disfavored, especially where the agent's service to one principal might disadvantage the other. Thus, when an agent for two principals negotiates a contract between them, the dual agency relationship itself is sufficient to cause the transaction to be closely scrutinized. *Gray v. Avco Realty & Dev. Co.*, No. CA–1943, 1981 WL 6237 at *3 (Ohio App. Richland County, Apr. 23, 1981) (unpublished).

37. Applying Ohio Revised Code § 3929.27 and general principles of agency law, the Court concludes that, at all times relevant, Oswald acted as an agent for St. Paul.

38. Oswald had both express and implied authority from St. Paul to represent St. Paul in its ongoing relationship with Lincoln Electric. However, St. Paul retained the ultimate right to control Oswald's dealings with Lincoln Electric concerning the issuance of the insurance policies and the administration and allocation of claims.

39. An agent has a fiduciary duty of loyalty not to act against the principal's interest without the principal's knowledge and consent and must disclose to the principal any conflicts of interest, including those relating to any dual agency. *General Acquisition, Inc.*, 766 F.Supp. at 1476 (stating that "[a] party owing fiduciary duties to another [must] disclose all material information that would affect the willingness of the other to establish or continue the relationship").

40. Ohio law imposes upon St. Paul fiduciary duty beyond its contractual duties of "good faith and fair dealing." This

**15.** *See generally* RESTATEMENT OF AGENCY 2d §§ 313, 394.

duty requires St. Paul to act in good faith towards Lincoln Electric at all times when adjusting, processing and paying Lincoln Electric's claims. This duty also encompasses an obligation to assess those claims in a fair and honest manner. St. Paul shall likewise exercise good faith by conducting appropriate and thorough claims investigations. *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 553–55, 644 N.E.2d 397 (1994), *cert denied*, 516 U.S. 809, 116 S.Ct. 56, 133 L.Ed.2d 20 (1995); *Staff Builders, Inc. v. Armstrong*, 37 Ohio St.3d 298, 302, 525 N.E.2d 783 (1988); *Hoskins, v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 275, 452 N.E.2d 1315 (1983).

■ 41. An insurer fails to exercise good faith in the processing of insured's claim when the insurer's refusal or failure to pay the claim (or part of the claim) is not based on circumstances that furnish "reasonable justification therefor." *Zoppo*, 71 Ohio St.3d at 555, 644 N.E.2d 397 (citing *Hart v. Republic Mut. Ins. Co.*, 152 Ohio St. 185, 87 N.E.2d 347 (1949); *Staff Builders*, 37 Ohio St.3d at 303, 525 N.E.2d 783).

■ 42. St. Paul is under a continuing obligation to act in good faith when processing Lincoln Electric's claims. This is true up to and after the point in time when St. Paul sued Lincoln Electric in March of 1996. *Spadafore v. Blue Shield*, 21 Ohio App.3d 201, 204, 486 N.E.2d 1201 (1985).

■ 43. To prevail on its bad faith claim, Lincoln Electric must establish by a preponderance of the evidence that: (a) St. Paul owed Lincoln Electric a duty of good faith; (b) St. Paul breached its duty of good faith to Lincoln Electric; and (c) as a direct and proximate result of St. Paul's breach of its duty of good faith, Lincoln Electric suffered damages. *Zoppo*, 71 Ohio St.3d at 554–56, 644 N.E.2d 397. See also *Zalac v. St. Paul Fire & Marine Ins. Co.*, No. 97APE04–544, 1997 WL 723236, *8 (Ohio App.10th Dist. Nov. 18, 1997) (suggesting that failure of an insurer to exercise good faith in processing claims could be extended to failure to exercise good faith in defending claims in future cases) (discussing applicable scope of *Zoppo*, 71 Ohio St.3d 552, 644 N.E.2d 397).

44. Here, Lincoln Electric fails to prove St. Paul breached its duty of good faith and fair dealing. Although wrong, St. Paul gave evidence of reasonable justification for its denial of Lincoln Electric's claims under the occurrence policies.

45. St. Paul and Oswald deliberately concealed Oswald's "profit-sharing" deal. But Lincoln Electric knew that St. Paul compensated Oswald and Lincoln Electric had little concern for the compensation received by Oswald. Also, St. Paul's incentive arrangement with the Oswald Agency was typical.

■ 46. St. Paul's duty of good faith and fair dealing included the duty to disclose to Lincoln Electric any conflicts of interest of which Lincoln Electric was unaware and to highlight any claim allocation where processing or assigning the claim could be done in a manner more favorable to Lincoln Electric.

■ 47. As an agent of St. Paul, Oswald was a fiduciary owing a duty of loyalty to its principal which included a duty to disclose to that principal any conflicts of interests and not to act for or participate with any adverse party in any deal without that principal's knowledge. *General Acquisition, Inc.*, 766 F.Supp. at 1475–76 (citing Restatement (Second) of Agency 2d §§ 387, 395, 396).

48. With knowledge that Oswald served as an agent for St. Paul, Lincoln Electric acquiesced in the dual agency employment. See Restatement of Agency (Second) 2d § 313, *Adversely Employing Agent of Another*, Comment on Subsection (1).

49. St. Paul has not proved that the parties intended the 1979–1985 deductible endorsements to apply to or affect pre–1979 policies. Those endorsements are clear and specific on their face and do not apply to prior policies. Even if the endorsements were susceptible of St. Paul's interpretation, St. Paul has not proved that its interpretation is the only reasonable one. The pre–1979 policies also expressly allow for changes only by subsequent written endorsement to each of those policies. St. Paul never issued any such endorsements explicitly modifying coverage under former policies. Lincoln Electric never signed any endorsement explicitly modifying coverage under former policies.

50. St. Paul bears the burden of establishing all affirmative defenses that would bar or reduce coverage for fumes claims under Lincoln Electric's policies. *Continental Ins. Co. v. Louis Marx & Co.*, 64 Ohio St.2d 399, 401, 415 N.E.2d 315 (1980); *MatchMaker Int'l, Inc. v. Long*, 100 Ohio App.3d 406, 654 N.E.2d 161 (1995).

51. St. Paul first claims that Lincoln Electric "waived" its right to assert any trigger/allocation under the pre–1985 policies different than that used by St. Paul.

■■■■ 52. Waiver is a voluntary relinquishment of a known right. *White Co. v. Canton Transp. Co.*, 131 Ohio St. 190, 2 N.E.2d 501 (1936) (syllabus at ¶1). The waiver of any term of a contract may be accomplished by a subsequent oral or written agreement or by the acts and conduct of the parties. *List & Son Co. v. Chase*, 80 Ohio St. 42, 49, 88 N.E. 120 (1909).

53. The party asserting the defense of waiver bears the burden to prove it by a preponderance of the evidence, by showing "a clear, unequivocal, and decisive act of the party against whom the waiver is asserted, showing such a purpose or acts amounting to an estoppel on his part." *Harry S. Peterson v. Detzel Const.*, No. C–961125, 1998 WL 107662, *2 (Ohio App.1st Dist. March 13, 1998) (citing *White Co.*, 131 Ohio St. at 190, 2 N.E.2d 501 (syllabus at ¶4)).

■■■ 54. St. Paul has not established a waiver defense. To prove that Lincoln Electric "clearly, unequivocally and decisively" waived such rights, St. Paul must show that Lincoln Electric (a) had certain contractual rights under the policies; (b) was fully aware of and fully understood the nature and extent of those contractual rights; and (c) despite such awareness and knowledge, it voluntarily and knowingly relinquished those contractual rights for the purpose of permanently abandoning those rights. *White Co. v. Canton Transp. Co.*, 131 Ohio St. at 190, 2 N.E.2d 501 (syllabus ¶4) (stating that "[h]e who asserts a waiver must prove ... a clear, unequivocal, decisive act.").[16]

55. St. Paul has not proved that Lincoln Electric "clearly, unequivocally and decisively," and knowingly, waived any rights under the occurrence policies. Nor has St. Paul proved that Lincoln Electric waived any rights as to welding fume claims filed against Lincoln Electric after the July 31, 1996, expiration of the St. Paul insurance program. Oswald and St. Paul did not fully disclose to Lincoln Electric its method for allocating claims to insurance policies. No knowing waiver was made.

56. St. Paul also claims that Lincoln Electric's prior conduct and statements should equitably estop Lincoln from asserting the trigger-of-coverage and claims-allocation the-

---

**16.** In *White,* the Court·discussed waiver, stating:

1. Waiver as applied to contracts is a voluntary relinquishment of a known right.

2. Courts move slowly and carefully when the claim is made that a party has waived the terms of a written contract and agreed to different terms by parole, as it amounts to an oral modification of a written contract.

3. Where a waiver comes after a breach of the original contract by the party claiming the benefit of the waiver, it should receive, not only careful, but serious consideration at the hands of courts, as such an arrangement is diametrically opposed to sound business principles.

4. He who affirms a waiver must prove it, and in so doing he must prove a clear, unequivocal, decisive act of the party against whom the waiver is asserted, showing such a purpose or acts amounting to an estoppel on his part.

5. If a party to a contract has a color of right to retake property sold on instalments for the further protection of his security, such taking is not malicious, and it is error for the trial court to submit such an issue to the jury under such circumstances, and the error is intensified when the court recognizes such issue in its general charge to the jury by instructing the jury on punitive damages.

6. No liability attaches to him who 'willfully' takes that which under the law he has a right to take.

*Id.* at 90. *See also B.F. Goodrich Co. v. American Motorists Ins. Co.*, 1986 WL 191786 at *11 (N.D.Ohio 1986) (finding that waiver evidenced by course of conduct must be "uniform, unquestioned, and fully concurred in by both parties.") (quoting *City of Cincinnati v. Cincinnati Gaslight & Coke Co.*, 53 Ohio St. 278, 286, 41 N.E. 239 (1895)); *Turner Liquidating Co. v. St. Paul Surplus Lines Ins. Co.*, 93 Ohio App.3d 292, 295, 638 N.E.2d 174 (1994); *North Olmsted v. Eliza Jennings, Inc.*, 91 Ohio App.3d 173, 180, 631 N.E.2d 1130 (1993); *Weaver v. Weaver*, 36 Ohio App.3d 210, 212, 522 N.E.2d 574 (1987).

ories it urges regarding the pre–1985 policies.

**57.** Equitable estoppel stops a party from asserting certain facts where the party, by his prior statements or conduct, has previously induced another person to change his position in good-faith reliance upon those prior statements or that conduct. *Turner Liquidating Co. v. St. Paul Surplus Lines Ins. Co.*, 93 Ohio App.3d 292, 295, 638 N.E.2d 174 (1994); *Gollings v. National Life Ins. Co.*, 92 Ohio App.3d 726, 730, 637 N.E.2d 76 (1994).

**58.** In determining whether estoppel is appropriate, the relevant factors to be considered include: (a) the nature of the representation; (b) whether the misrepresentation was in fact misleading; (c) the relative knowledge and experience of the parties; (d) whether the representation was made with the intent that it be relied upon; and (e) the reasonableness and good faith of the reliance, given all the facts and circumstances. *First Fed. Sav. & Loan v. Perry's Landing, Inc.*, 11 Ohio App.3d 135, 145–46, 463 N.E.2d 636 (1983). See also *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1217 (6th Cir.1987), cert. denied, 484 U.S. 820, 108 S.Ct. 77, 98 L.Ed.2d 40 (1987).

**59.** To establish the affirmative defense of estoppel, St. Paul must prove by a preponderance of the evidence that:

(a) Lincoln Electric previously made a representation, by words, acts or silence, relating to trigger-of-coverage and claims-allocation theories applicable to the pre–1985 occurrence policies;

(b) The facts underlying Lincoln Electric's representation were known to Lincoln Electric or that the circumstances were such that Lincoln Electric was chargeable with knowledge of them;

(c) Lincoln Electric's representation was misleading in some way;

(d) Lincoln Electric's misrepresentations induced St. Paul's reliance, and such reliance was reasonable under the circumstances and made in good faith; and

(e) St. Paul would suffer prejudice or pecuniary disadvantage if the Lincoln Electric were not estopped from asserting a right in contradiction to its earlier representation.

*Perry's Landing, Inc.*, 11 Ohio App.3d at 145, 463 N.E.2d 636.

**60.** A party invoking the equitable doctrine of estoppel must come to equity with clean hands. Equity will not assist a party that is guilty of inequitable conduct in the matter in which the party seeks equitable intervention. *Kinsman·Nat'l Bank v. Jerko*, 111 Ohio St. 633, 635, 146 N.E. 210 (1924).

61. St. Paul has not proved that Lincoln Electric should be estopped from asserting its rights under pre–1985 policies for welding-fumes claims filed against Lincoln Electric through July 1996 or after the July 31, 1996, expiration of the St. Paul insurance program. Rather, St. Paul breached the occurrence policies by not applying the terms, limits and deductibles of an occurrence policy to each welding fumes lawsuit in which a plaintiff alleged exposure to or injury by fumes or asbestos during a period that the policy covers.

**62.** St. Paul also asserts the affirmative defense of laches. Laches is an equitable doctrine which bars action based on unexcused delay which has prejudiced an adversary. The elements of the defense of laches are: (a) unreasonable delay or lapse of time in asserting right; (b) absence of excuse for delay; (c) knowledge, actual or constructive, of injury or wrong; and (d) prejudice to the other party (not inferred from the mere passage of time). *State ex rel. Polo v. Cuyahoga Cty. Bd. of Elections*, 74 Ohio St.3d 143, 145–46, 656 N.E.2d 1277 (1995).

63. St. Paul has not given sufficient evidence that Lincoln Electric caused unreasonable delay such to prejudice St. Paul, or that Lincoln Electric had knowledge of St. Paul's possible breach of contract until Lincoln began to investigate the claim allocation process sometime in late 1995 or early 1996.

64. St. Paul also breached the occurrence policies by implementing a trigger of coverage that was to its benefit and to the detriment of Lincoln Electric, while at the same time not disclosing to Lincoln Electric other potential triggers of coverage.

65. St. Paul also breached the occurrence policies by inducing Lincoln Electric to pay deductibles for indemnity and expenses in

excess of amounts fixed by the occurrence policies, depriving Lincoln Electric of its bargained-for rights to defense of and indemnity for the welding fumes cases under those policies.

66. St. Paul further breached the occurrence policies by refusing to accept the defense or to acknowledge coverage for welding fumes cases filed on or after August 1, 1996, even though these claims trigger coverage under the occurrence policies.

67. For the reasons stated herein, the Court concludes that Lincoln Electric is entitled damages the in an amount of money that will fairly and reasonably compensate those losses flowing from St. Paul's breach of the pre–1985 policies, or, in other words, the amount of the coverage to which Lincoln Electric was, and is, entitled under the terms of the occurrence policies. *DeSantis v. Smedley*, 34 Ohio App.3d 218, 221, 517 N.E.2d 1038 (1986).

68. St. Paul's breaches of contract damaged Lincoln Electric in the amount of $23,-537,313.00 for the period through December 1997. This amount equals the difference between the amount Lincoln Electric paid for defense costs, settlements and judgments pursuant to St. Paul's allocation of claims to policies, and the amount Lincoln Electric would have paid had St. Paul properly allocated the claims to policies.

69. These damages reflect how the claims should be allocated according to those Lincoln Electric occurrence policies with the most favorable deductible. Accordingly, for the policies in effect prior to August 1, 1979, the calculations assume a $5,000.00 indemnity deductible and no expenses deductible. For policies in effect from August 18, 1979 through July 31, 1985, the damage calculation assumes a $25,000.00 for both indemnity and expenses combined. For the policies in effect beginning August 1, 1985 and thereafter, the calculations assume various levels of deductibles.[17]

70. Lincoln Electric has continued to be harmed, and will be harmed in the future, by St. Paul's refusal to accept full defense and indemnity responsibility for welding fume cases under the occurrence policies.

71. The award of prejudgment interest is compensation to the plaintiff for the period of time between accrual of the claim and judgment, regardless of whether the judgment is based on a claim which was liquidated or unliquidated and even if the sum due was not capable of ascertainment until determined by the court. *Royal Elec. Constr. Corp. v. Ohio State Univ.*, 73 Ohio St.3d 110, 117, 652 N.E.2d 687 (1995). When determining entitlement to pre-judgment interest in a breach of contract case, a court's focus "should not be based on whether the claim can be classified as 'liquidated,' 'unliquidated' or 'capable of ascertainment.' Rather, in determining whether to award prejudgment interest ..., a court need only ask one question: Has the aggrieved party been fully compensated?" *Id.* at 116, 652 N.E.2d 687.

72. The Court concludes that Lincoln Electric is entitled to an award of prejudgment interest. As a direct and proximate result of St. Paul's wrongful conduct, Lincoln Electric lost access and use of certain funds for the period through December 1997. To fully compensate Lincoln Electric for this loss, the Court awards pre-judgment interest in an amount to be determined.

73. The Court also concludes that Lincoln Electric is entitled to declaratory relief concerning the application of its occurrence insurance coverage to future welding-fumes claims. Therefore, the Court declares that:

a. Any pre-August 1, 1985, occurrence policy is triggered by any fumes claim where the claimant suffered or alleged some bodily injury during the policy period. Any such "bodily injury" is deemed to occur at any point along the continuum of injury from the claimant's initial exposure to welding fumes until diagnosis of the claimant's injury, sickness, illness or disease or death.

b. Lincoln Electric is entitled to select that triggered policy or policies which will pay all of Lincoln Electric's de-

---

**17.** See Testimony of William Jones discussing Peterson reports; Defendant's Exhibit 562A, 562B

fense or indemnity costs in a particular case.

c. St. Paul must defend the entire welding-fumes action when the underlying fumes complaint states at least a claim partially or arguably within the scope of coverage.

d. St. Paul cannot avoid its contractual promises by seeking to shift the costs of defending the underlying cases.

e. The deductible to be applied is the one expressly specified in the triggered policy itself, or, for any "lost" policy, the deductible, if any, that this Court has determined was part of and applies to that particular policy.[18]

74. As to St. Paul's counterclaims against Lincoln Electric, St. Paul's first seeks a declaratory judgment affirming St. Paul's interpretation of the policies. Because the Court has resolved these issues in Lincoln Electric's favor, the Court concludes that Lincoln Electric is entitled to judgment on St. Paul's first counterclaim.

■■■■ 75. St. Paul's second counterclaim seeks reformation of the policies to conform to St. Paul's interpretation. Reformation is a remedy by which a writing is corrected to express the agreement that the parties originally intended to express. Reformation is generally available on grounds of mutual or unilateral mistake or fraud. *Goodyear Tire & Rubber Co. v. Aetna Cas. and Sur. Co.,* No. 16993, 1995 WL 422733, *10 (Ohio App.9th Dist. July 12, 1995). A party is entitled to reformation when the mistake is established by clear and convincing evidence. *Justarr Corp. v. Buckeye Union Ins. Co.,* 102 Ohio App.3d 222, 656 N.E.2d 1345 (1995). As discussed, St. Paul has not given sufficient evidence of mistake or fraud.

■■■ 76. Under Ohio law, an action to reform a written contract must be commenced within ten years after the cause of action accrues. Ohio Rev.Code § 2305.14 (formerly R.S. 4985); *Bryant v. Swetland,* 48 Ohio St. 194, 27 N.E. 100 (1891) (syllabus ¶ 1); *Sams v. Nolan,* No. 1326, 1987 WL 13947 at *3 (Ohio App.4th Dist.1987). Fur-

thermore, a reformation claim accrues upon execution of the written instrument, even if the mistake is not discovered until after the party seeking reformation is sued on the contract. *Sams,* 1987 WL 13947 at *3; *Bryant,* 48 Ohio St. at 194, 27 N.E. 100 (syllabus ¶ 3).

77. St. Paul sold to Lincoln the last of those pre–1985 policies on or before August 1, 1984. St. Paul did not seek reformation of these policies until 1996, two years after the limitations period for the last pre–1985 policy expired.

78. Because the Court has resolved these issue in Lincoln Electric's favor, Lincoln Electric is entitled to judgment on St. Paul's second counterclaim.

■■■■ 79. St. Paul's third counterclaim alleges breach of contract based on Lincoln Electric's supposed "repudiation" of certain insurance agreements. A breach of a contract is a failure, without legal excuse, to perform any promise which forms the whole or part of the contract. Non-performance of a contractual duty is an essential element of breach of contract. *Tait v. North America Equitable Life Assur. Co.,* 194 N.E.2d 456, 92 Ohio Law. Abs. 551, 558–59 (Ohio Com.Pl. 1963), *aff'd,* 195 N.E.2d 128 (Ohio App.1st Dist.1963).

80. St. Paul does not allege that Lincoln Electric failed to perform any act required by the insurance policies. St. Paul does not allege that Lincoln failed to pay any premiums or deductibles, to give notice of claims, or to cooperate in defense of the welding fume litigation. St. Paul merely alleges that Lincoln Electric disagrees with St. Paul's denial of coverage under the occurrence policies for welding fume cases.

81. To the extent St. Paul alleges Lincoln Electric breached any contracts by urging an incorrect interpretation of the policies, such allegations fail because, for the reasons set forth above, the Court has resolved these issues in Lincoln Electric's favor. The Court concludes that Lincoln Electric did not breach any contracts with St. Paul and that

---

**18.** *See e.g. Keene,* 667 F.2d at 1050; *Ins. Co. of No. America,* 633 F.2d at 1223–25; *Owens–Corn-ing,* 74 Ohio Misc.2d at 217–19, 660 N.E.2d 770.

Lincoln Electric is entitled to judgment on St. Paul's third counterclaim.

82. St. Paul's fourth counterclaim asserts that, at the time Lincoln Electric purchased the 1995–96 policy, Lincoln Electric did not disclose its intention to "repudiate" the parties' alleged agreements concerning interpretation of earlier policies. St. Paul alleges that it would not have issued the 1995–96 policy had it known Lincoln intended to "change its position" concerning coverage under the occurrence policies.

83. St. Paul fails to show that Lincoln Electric had made any final decision to bring action against St. Paul at the time the 1995 policy was renewed. St. Paul does not allege that Lincoln Electric misrepresented anything in answers to questions in insurance applications. St. Paul does not allege that Lincoln Electric failed to inform St. Paul of any material risks covered by the policies. St. Paul does not identify any affirmative obligation Lincoln Electric promised to undertake but failed to perform.

84. To set aside a contract on the ground of fraud, St. Paul must prove, by clear and convincing evidence, each of the following elements:

(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Gaines v. Preterm–Cleveland, Inc.*, 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987); *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954) (syllabus ¶ 2). An insured is not bound to communicate its expectations and opinions to its insurer.

85. A party to a contract containing an integration clause may not assert a claim for fraud based on promises extrinsic to the contract. *Coal Resources, Inc. v. Gulf & Western Indus., Inc.*, 756 F.2d 443, 446 (6th Cir.1985).

86. To the extent St. Paul alleges Lincoln Electric committed fraud by not disclosing its intent to repudiate agreements concerning policy interpretation on the issues of trigger and claims allocation, the Court concludes that fourth counterclaim fails because St. Paul fails to show that Lincoln Electric had reached any conclusion on the appropriate allocation under the policies at the time of the 1995 renewal.

87. Additionally, St. Paul's fourth counterclaim fails for the reason that Lincoln Electric was not obliged to disclose its opinions of law and expectations of coverage to St. Paul, nor could Lincoln Electric's opinions or expectations be the basis of a fraud claim. St. Paul has not proved a misrepresentation of a material fact.

88. Because St. Paul has not proved the elements of fraud, the Court concludes that Lincoln Electric is entitled to judgment on St. Paul's fourth counterclaim.

89. For the reasons outlined above, the Court concludes that Lincoln Electric is entitled to judgment. Lincoln Electric has proved that it sustained compensatory damage because of St. Paul's breach of contract in the amount of $23,537,313.00 for the period through December 1997.[19]

90. Lincoln Electric has not proved that St. Paul's breach of contract was in bad faith. Accordingly, Lincoln is not entitled to punitive damages from St. Paul.

91. The parties shall bear their own fees, costs and expenses.

IT IS SO ORDERED.

---

**19.** The Court accepts the report of Peterson Consulting as an accurate reflection of the damages sustained by Lincoln Electric in this action. *See* Defendant's Exhibit 562A, breaking out the damages as follows: Lincoln Electric's costs for welding fume cases: $18,291,693.00 (legal expenses) and $1,586,868.00 (indemnity); Lincoln Electric's costs for manganese cases: $2,572,-184.00 (legal expenses) and $1,086,586 (indemnity); for a total of $23,537,313.00.